In re ALL AMERICAN MANUFACTURING CORP., Debtor.

ALL AMERICAN MANUFACTURING CORP., a Florida corporation, Plaintiff,

v.

QUALITY TEXTILE SCREEN PRINTS, INC., a Florida corporation, and Vendor Funding Co., Inc., a New York corporation, Defendants.

Bankruptcy No. 94–10904–BKC–RAM.
Adv. No. 94–0512–BKC–RAM–A.

United States Bankruptcy Court,
S.D. Florida.

Sept. 21, 1994.

3. The allowed amount of claim 28 is:

| year | tax | interest | penalty |
|------|------|----------|---------|
| 1985 | 0 | $142,475.31 | 0 |
| 1986 | $47,613.00 | $ 80,290.03 | $4,761.00 |
| 1987 | 0 | $ 38,271.48 | $ 47.88 |

Total: $313,458.70

Mark A. Salzberg, Aragon, Martin, Burlington & Crockett, P.A., Miami, FL, for debtor/plaintiff.

Monroe Gelb, Gelb & Spatz, Miami, FL, for defendant Quality Textile Screen Prints, Inc.

## MEMORANDUM OPINION

ROBERT A. MARK, Bankruptcy Judge.

On June 9, 1994, the debtor, All American Manufacturing Corp. ("All American") filed an adversary complaint (the "Complaint")

against defendants, Quality Textile Screen Prints, Inc. ("Quality Textile") and Vendor Funding Co., Inc. ("Vendor Funding"). The Complaint seeks (1) a determination of the validity, priority and extent of any liens held by Vendor Funding and Quality Textile on certain equipment in the possession of All American; and (2) a determination of whether a January 21, 1992 Agreement entered into between All American and Quality Textile should be considered a financing agreement or a lease.

A default judgment was entered against Vendor Funding on September 1, 1994. The Complaint against Quality Textile was tried on September 16, 1994. At the conclusion of the trial, the Court announced its findings and conclusions on the record. This opinion incorporates and supplements those oral findings.

### FACTS

On September 6, 1989, Quality Textile and Vendor Funding entered into an agreement (the "Initial Agreement"), which bears the title "Lease Agreement." The Initial Agreement required Vendor Funding to purchase, and arrange for the delivery to Quality Textile of, certain equipment described as: (1) one Precision and Color Jumbo Oval Pallet Printer with one set of 26″ pallets, squeegees and flood bars, Model # OPP–32EE/1–22–2835; (2) one Micro Registration System; and (3) one additional set of 15″ pallets, squeegees and flood bars (collectively referred to as the "Equipment"). The Equipment is designed to be used to print fabrics and garments in an automated fashion. Vendor Funding retained title to the Equipment, and Vendor Funding was authorized by Quality Textile to record its security interest in the Equipment.

Pursuant to the Initial Agreement, Quality Textile was required to make an initial payment of $5,893.89 to Vendor Funding (representing advance payments for the first and last two months under the Initial Agreement), and to make monthly payments to Vendor Funding of $1,964.63 for the Initial Agreement's sixty (60) month term. Due to other additional charges, these payments were actually $2,082.51 per month. Quality Textile was further required to pay all taxes, license and registration fees and similar charges imposed on the ownership, possession, or use of the Equipment during the term of the Initial Agreement, and to pay all taxes imposed on Vendor Funding with respect to the rental payments and Equipment, except Vendor Funding's federal or state net income taxes. Quality Textile was required to pay the costs and expenses of maintaining the Equipment in a state of good repair, and assumed the entire risk of loss, damage or destruction of the Equipment. Moreover, Quality Textile had to maintain insurance on the Equipment, with Vendor Funding named as the loss payee. Upon Quality Textile's default under the terms of the Initial Agreement, Vendor funding could either accelerate the total amount due, with penalties, or retake possession and remove the Equipment from Quality Textile's premises. The Initial Agreement explicitly provided that Quality Textile could not cancel or terminate the Initial Agreement. As part of the Initial Agreement, Vendor Funding granted Quality Textile an option to purchase the Equipment at the end of the original sixty month term for the sum of $1.00 (the "Purchase Option").

Vendor Funding purchased the Equipment on August 2, 1989, and shipped it to Quality Textile on September 6, 1989. Vendor Funding perfected its security interest in the Equipment by filing a UCC–1 with the Florida Secretary of State. Vendor Funding's security interest in the Equipment was assigned to LINC Finance Corporation on July 19, 1993. On April 25, 1994, LINC terminated its security interest in the Equipment by filing a UCC–3 Termination Statement.

By November 1991, Quality Textile had ceased doing business and had tried, albeit unsuccessfully, to terminate its obligations to Vendor Funding under the Initial Agreement. Sometime in November 1991, the President of Quality Textile, Anthony Martone, was introduced to Buddy Meyers, the President of All American, who expressed a desire to take over Quality Textile's interests in the Equipment and under the Initial Agreement, and to ultimately own the Equipment outright. Accordingly, on January 21, 1992, Quality Textile and All American en-

tered into an agreement (the "Second Agreement"), under which All American acquired Quality Textile's interest in and to the Equipment and Initial Agreement.

Under the terms of the Second Agreement, All American was obligated to: (1) pay Quality Textile $1,900 per month for the thirty remaining months under the term of the Initial Agreement; (2) tag the Equipment so as to indicate that the owner of the Equipment was Vendor Funding; (3) assume any and all liability for sales tax and 1992 personal property tax which may be required to be paid; (4) maintain fire insurance and liability policy insuring the Equipment; and (5) maintain the Equipment in a state of good repair. By letter dated January 21, 1992, Mr. Martone informed Mr. Meyers that Quality Textile's attorney had forgotten to include tax obligations in his calculations of the monthly payments due, and that the correct amount All American had to pay Quality Textile was $2,082.51 per month, the same amount Quality Textile had been paying Vendor Funding under the Initial Agreement. Pursuant to Paragraph 14 of the Second Agreement, and as stipulated to by Quality Textile in the Pretrial Order entered in this proceeding, Quality Textile was required to exercise the Purchase Option contained in the Initial Agreement and to transfer the Bill of Sale for the Equipment to All American.

The Second Agreement obligated All American to execute any UCC–1's that Quality chose to file. Quality made no such request and never filed a UCC–1 financing statement. All American made regular monthly payments to Quality Textile until approximately November 1993, and paid all required taxes, maintenance fees and insurance costs. From January 1992 until September 1994, All American paid Quality Textile $47,894.20 out of the total amount due under the Second Agreement of $62,475.20, leaving a balance due of $14,581.

All American filed a petition commencing this Chapter 11 case on March 8, 1994. On May 9, 1994, Quality Textile filed a Motion for Stay Relief which was heard by the Court on May 31, 1994. The Court held that the Second Agreement would be treated as a lease unless and until otherwise ordered by the Court. That Order also directed All American to start making the $2,080.51 monthly payments required under the Second Agreement, with the first payment due on June 10, 1994.

All American filed this Complaint on June 9, 1994, seeking a determination that the Second Agreement is a financing transaction, and a determination that Quality Textile did not perfect its security interest under the Second Agreement.

### DISCUSSION

State law determines whether the Second Agreement should be treated as a lease or financing agreement. *In re Howell,* 161 B.R. 285, 287 (Bankr.N.D.Fla.1993). Whether a purported lease transaction creates a security interest here is governed by subparagraph (a) of § 671.201(37) Florida Statutes, which provides as follows:

> A *transaction creates a security interest* if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, *and;* (1) The original term of the lease is equal to or greater than the remaining economic life of the goods; (2) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods; (3) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; *or* (4) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

(emphasis added). By its terms, § 671.-201(37) mandates that if a "lease" contains both a non-termination clause, whereby the "lessee" may not terminate the "lease" without further obligation, and also contains one of the other provisions listed in subsections (a)(1)–(4), then the Court must find that the transaction in question is a financing transac-

tion, rather than a true lease. *Howell,* 161 B.R. at 288–89.

■ The Initial Agreement here contains an express provision preventing cancellation. The Second Agreement likewise is non-cancelable, since All American could not terminate the Second Agreement without further obligation to Quality Textile.[1] Thus, the first prong of § 671.201(37)(a) is satisfied. The second prong of § 671.201(37)(a) also is satisfied since, as stipulated to by Quality Textile in the Pretrial Order, Quality Textile was obligated to purchase the Equipment and to transfer title to All American at the end of the Second Agreement. *See Fla.Stat.* § 671.201(37)(a)(2) (a transaction creates a security interest if "[t]he lessee is bound to ... become the owner of the goods.").

■ Even if Quality Textile was not bound to purchase the Equipment, the $1.00 purchase price under the Purchase Option represents nominal consideration, since the Equipment certainly had a fair market value far greater than $1.00 at the date the Purchase Option was to be exercised. *See Fla. Stat.* § 671.201(37)(c)(1). This conclusion is supported by decisions finding higher option prices to be nominal consideration, *compare Howell,* 161 B.R. at 290 (option price of $1,000 held to be nominal), *In re Royal Food Markets, Inc.,* 121 B.R. 913, 915 (Bankr. S.D.Fla.1990) (consideration nominal if option price is less than 25% of original purchase price), *In re AAA Machine Co.,* 30 B.R. 323, 325 (Bankr.S.D.Fla.1983) (option price less than 25% of original purchase price nominal), and by other cases finding specifically that a purchase option exercise price of $1.00 is both nominal consideration and indicative of a financing arrangement. *In re Canaveral Seafoods, Inc.,* 79 B.R. 57, 58 (Bankr.

M.D.Fla.1987); *United States v. Federal Ins. Co.,* 634 F.2d 1050 (10th Cir.1980) ($1.00 purchase price indicative of financing arrangement under Oklahoma law). In sum, since the Second Agreement was non-cancelable and included by incorporation a nominal $1.00 purchase option, this Court finds that under the mandatory provisions of *Fla.Stat.* § 671.201(37)(a) the Second Agreement constituted a financing arrangement rather than a true lease.

■ The Court would reach the same conclusion by applying the discretionary standards set forth in *Fla.Stat.* § 671.-201(37)(b). Section 671.201(37)(b) provides a non-exclusive list of factors that are indicative of a financing arrangement rather than a true lease.[2] These factors include:

(1) The lessee assumes the risk of loss of the goods or agrees to pay taxes;

(2) The lessee agrees to pay insurance;

(3) The lessee agrees to pay filing, recording or registration fees;

(4) The lessee agrees to pay service or maintenance costs; and

(5) The lessee has an option to become the owner of the goods.

All of these indicia of a financing agreement are present here. All American is responsible for insuring the Equipment. All American is further responsible for the payment of all sales tax and 1992 personal property taxes, and is responsible for maintenance and repair of the Equipment. Additionally, under the terms of the Second Agreement, Quality Textile is required to exercise the $1.00 Purchase Option, and to transfer title to All American at the end of the Second Agreement's term. Moreover, upon All American's default under the Second Agreement, Quality Textile had the right

---

**1.** Any doubt as to the non-cancelable nature of the Second Agreement is removed by the Second Agreement's requirement that All American make *all* of the approximately thirty remaining payments due to by paid by Quality Textile to Vendor Funding under the terms of the Initial Agreement. There is a complete absence of any language indicating that All American simply could keep the Equipment for as long as desired, so long as All American made the monthly payments. Instead, the Second Agreement specifically requires All American to "make payments in the sum of $1,900.00 a month and monthly

thereafter in a like amount until said machine is fully paid."

**2.** Although § 671.201(37)(b) by its terms states that a transaction does not create a security interest merely because it provides for any one of the listed factors, all of the factors may be considered in determining whether a lease constitutes a security interest. *See Howell,* 161 B.R. at 290; *In re Chisholm,* 54 B.R. 52 (Bankr.M.D.Fla. 1985); *AAA Machine Co.,* 30 B.R. 323.

to repossess the Equipment. The presence of these several indicia of a financing agreement prove that the Second Agreement was not a true lease, but instead was a financing arrangement creating a security interest.

In sum, under either under the applicable mandatory provisions of *Fla.Stat.* § 671.-201(37)(a) or the discretionary factors listed in § 671.201(37)(b), the Second Agreement was not a true lease, but was instead a financing arrangement, intended to create a security interest.[3]

█ Having found that the Second Agreement was not a true lease, the remaining issue is whether Quality Textile has a perfected security interest in the Equipment. Under Florida law, a creditor seeking to perfect a security interest must either file a financing statement pursuant to *Fla.Stat.* § 679.302 or take possession of the collateral pursuant to *Fla.Stat.* § 679.305. *See Royal Food Markets,* 121 B.R. at 916. Quality Textile never filed a financing statement nor took possession of the collateral, and therefore failed to perfect its security interest. As such, the balance owed under the Second Agreement, stipulated to be $14,581, is an unsecured claim in this case.

The Court will enter a separate Final Judgment determining that (1) the Second Agreement is a financing transaction intended to create a security interest, not a true lease; and (2) Quality Textile failed to perfect its security interest and therefore holds an unsecured claim in the amount of $14,581, the balance owed under the Second Agreement.

---

**3.** This same analysis would apply under New York law, which arguably may govern disputes with regard to the Initial Agreement, and leads to the inescapable conclusion that the Initial Agreement likewise was not a true lease, but instead was intended to create a security interest. *See Orix Credit Alliance, Inc. v. Pappas,* 946 F.2d 1258 (7th Cir.1991) (applying New York's Uniform Commercial Code).