In re LYKES BROS. STEAMSHIP
CO., INC., Debtor.

AMERICAN PRESIDENT LINES,
LTD., Plaintiff,

v.

LYKES BROS. STEAMSHIP CO., INC., a
Louisiana corporation; Mitsui Engi-
neering & Shipbuilding Co., a Japanese
corporation; Mitsubishi Heavy Indus-
tries, Ltd., a Japanese corporation; Me-
ridian Trust Co., a Pennsylvania trust
company, as Trustee; Blue Water Asso-
ciates, L.P., a Delaware limited partner-
ship; The Chase Manhattan Bank, N.A.,
as Trustee; GATX Capital Corp., a Dela-
ware corporation; GATX Financial Ser-
vices, a Delaware corporation and Gil-
man Financial Services, Inc., a Delaware
corporation, Defendants.

LYKES BROS. STEAMSHIP CO.,
INC., Counter–Plaintiff and
Cross–Plaintiff,

v.

AMERICAN PRESIDENT LINES,
INC., as Counter–Defendant,

and

Mitsui Engineering and Shipbuilding Co.,
Ltd., a Japanese corporation; Mitsubishi
Heavy Industries, Ltd., a Japanese cor-
poration; Meridian Trust Co., a Penn-
sylvania trust company, as Trustee;
Blue Water Associates, L.P., a Delaware
limited partnership; The Chase Manhat-
tan Bank, N.A., as Trustee; Gatx Capi-
tal Corp., a Delaware corporation; and
Gilman Financial Services, Inc., a Dela-
ware corporation, Cross–Defendants.

Bankruptcy No. 95–10453–8P1.
Adv. No. 95–771.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

April 8, 1996.

Mark J. Wolfson, Foley & Lardner, Tam-
pa, FL, K. Rodney May, Foley & Lardner,
Orlando, FL, William Bates, III, McCutchen,
Doyle, Brown & Enerson, San Francisco,
CA, for plaintiffs.

Glenn Siegel, Winthrop, Stimson, Putnam
& Roberts, Martin G. Bunin, Ried & Priest,
LLP, Robert Simon/Ronald Cohen, Seward
& Kissel, New York City, Zala Forizs, Bla-
singame, Forizs, & Smiljanich, P.A., St. Pe-
tersburg, FL, for Mitsui & Mitsubishi.

Robert A. Soriano, Carlton, Fields, Ward,
Emmanuel, Smith & Cutler, Tampa, FL, for
J.P. Morgan, Delaware.

Robert D. Drain/Alan Kornberg, Paul,
Weiss, Rifkind, Wharton & Garrison, New
York City, for Blue Water, Meridian.

Tom C. Nord, San Francisco, CA, for GATX Capital Corp.

Harley Riedel, Tampa, FL, for Lykes Bros. Steamship.

John D. Emmanuel, Fowler, White, Gillen, Boggs, Villareal, & Banker, P.A., Tampa FL, for Blue Water, GATXs. Gilman.

Elizabeth L. Battle, Dewey Ballantine, New York City, for Chase Manhattan.

Mark P. Hirschhorn, New York City, for Gilman Financial Services, Inc.

Paul S. Singerman, Miami, FL, for Creditors' Committee Atty.

## ORDER ON (1) MOTION OF LYKES BROS. STEAMSHIP CO., INC. FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO COUNTS I AND II OF ITS COUNTERCLAIM AND CROSS–CLAIM AND (2) MOTION BY BLUE WATER ASSOCIATES, L.P., GATX FINANCIAL SERVICES, INC., GATX CAPITAL CORP., AND GILMAN FINANCIAL SERVICES, INC. FOR SUMMARY JUDGMENT DISMISSING CROSS–CLAIMS OF LYKES BROS. STEAMSHIP CO., INC.

ALEXANDER L. PASKAY, Chief Judge.

This is a Chapter 11 reorganization case and the matters under consideration are two Motions for Summary Judgment. One is filed by the Debtor, Lykes Bros. Steamship Co., Inc. (Lykes) and the other by Blue Water Associates, L.P., GATX Financial Services, Inc., GATX Capital Corp., and Gilman Financial Services, Inc. (Blue Water). Both Motions are addressed to Counts I and Count II of Lykes' Cross–Claim against Blue Water. Each side contends that there are no genuine issues of material fact concerning the two claims under consideration and they are entitled to the relief they seek in their respective favors as a matter of law.

The claim of Lykes in Count I of its Cross–Claim against Blue Water is based on the contention that the transaction between Lykes and Blue Water was, in fact, a financing transaction and not a true lease and the relief sought is a declaration by this Court that this contention is correct. The claim in Count II of the Cross–Claim seeks a decree to quiet the title in the four vessels further described below and deem them owned by Lykes.

In due course, Blue Water filed its own Motion for Partial Summary Judgment, of course, contending the opposite; that is, that the transaction between Blue Water and Lykes concerning the four vessels was a pure and true lease. Under that theory, the vessels were owned and still are owned by Blue Water and Lykes' interest is limited to rights of a charterer of vessels under the transaction as documented between the parties. As an aside, it should be noted that Blue Water also filed an "Objection to Lykes' Motion for Summary Judgment," a pleading unknown in federal practice.

In support of its Motion for Summary Judgment, Lykes filed four Affidavits: two by Allen G. Tomek (Tomek) and two by Carl J. Horn (Horn), both of whom are employees of Lykes. In support of its Motion for Summary Judgment, Blue Water filed two Affidavits: one by Thomas C. Nord (Nord) and the other by Mark P. Hirschhorn (Hirschhorn), both of whom were in-house attorneys of Blue Water at the time their Affidavits were filed. In addition, the Debtor and Blue Water rely on numerous and voluminous documents evidencing the transaction between the parties which will be discussed in greater detail below. As a preliminary matter, it should be noted that none of the facts surrounding the series of transactions are in serious dispute, but, of course, the parties offer widely different interpretations of those facts and suggest different conclusions from same. The relevant facts as they appear from the record are as follows:

## I. CAST OF CHARACTERS— THE MAJOR PLAYERS.

American President Lines, Ltd. (APL) is a Delaware corporation and maintains its principal place of business in Oakland, California. At all relevant times, APL was the owner or charterer/operator of a merchant marine fleet of vessels.

**576**

Lykes, the Debtor–In–Possession, is a Louisiana corporation which maintains its principal place of business in Tampa, Florida. Lykes was, and still is, the owner and operator of a merchant fleet just as APL.

Blue Water Associates, L.P. is a partnership organized under the laws of Delaware.

Meridian Trust Co. is a trust company organized under the laws of Pennsylvania and is Trustee for Blue Water Parties.

Both Mitsui Engineering and Shipbuilding Co. (Mitsui) and Mitsubishi Heavy Industries, Ltd. (Mitsubishi) are corporations organized and existing under the laws of Japan.

Chase Manhattan Bank, N.A. is a national banking association organized and existing under the laws of the United States of America and is Trustee for Mitsui and Mitsubishi.

GATX Capital Corp. is a Delaware corporation with its principal place of business in San Francisco, California.

Gilman Financial Services, Inc. is also a Delaware corporation with its principal place of business in New York, New York.

InterOcean Steamship Corp. (InterOcean) is a Florida corporation with its principal place of business in Tampa, Florida. InterOcean is the parent company of Lykes.

Blue Water, GATX Capital, GATX Financial and Gilman are collectively referred to as the Blue Water group or Blue Water Partners and. are all financing institutions, as is Meridian which serves as Trustee for the Blue Water Group.

## II. EVENTS LEADING UP TO THE PRESENT CONTROVERSY.

On December 17, 1986, APL and Lykes entered into reciprocal Bareboat Charter Agreements (Debtor's Exhibit B) under which Lykes chartered four vessels to APL named, respectively, M/V PRESIDENT ARTHUR, M/V PRESIDENT BUCHANAN, M/V PRESIDENT GARFIELD AND M/V PRESIDENT HARDING, referred to by the Parties as the "Pacific-class or L–9 Vessels". In turn, APL chartered four vessels to Lykes, three of which were Seamaster class ships and one of which was a C–5 class vessel. The initial terms of these Charter

Agreements were three years with two successive three-year options exercisable by APL. Both options were exercised and, thus, the second option will expire shortly— that is, in 1996.

The Pacific-class or L–9 vessels Lykes chartered to APL were to be built by two Japanese shipyards, Mitsubishi and Mitsui, respectively. The construction contracts, which were executed in 1984, initially called for the construction of three Pacific-class vessels by Mitsubishi and three by Mitsui. However, because of the economic crisis it faced, Lykes decided to cancel its trans-Pacific operation. Thus, before construction was completed, Lykes entered into negotiations with Mitsubishi to cancel its construction contracts on two of the vessels. Those negotiations culminated with an agreement pursuant to which Lykes agreed to pay Mitsubishi approximately $19 million as termination damages. As the result of mitigation of certain damages, that amount was later reduced to $5 million. In order to avoid any additional penalties, and since Mitsui and Mitsubishi agreed to finance the purchase price of the remaining four vessels, Lykes agreed to take delivery of the those vessels upon completion.

Under the construction contract, Mitsubishi was required to build a vessel bearing Hull No. 11158 for Lykes. The construction price was $41 million U.S. dollars toward which Lykes was entitled to a $2 million rebate. Lykes made an initial deposit of $4 million toward the purchase price, which was to be credited to Lykes upon closing. The three construction contracts with Mitsui were for vessels bearing Hulls Nos. 1323, 1324, and 1325. The construction price in U.S. dollars was approximately $41 million per vessel. Again, Lykes was entitled to a $2 million rebate per vessel. Lykes deposited more than $16 million toward the purchase price which was to be credited to Lykes upon closing. Lykes' contract with Mitsui contained a provision designed to protect Lykes against currency fluctuation risks and upon termination of the contract with Mitsui, Lykes agreed to an adjustment of the purchase price to reflect the then prevailing

exchange rate which added an additional $18 million to the purchase price.

The construction of the three Mitsui vessels was completed on March 30, 1987, April 6, 1987, and April 28, 1987, respectively. Upon delivery, Lykes became the fee title owner of the vessels which were registered as U.S. flag vessels under the names M/V President Arthur, M/V President Buchanan and M/V President Harding. As security for the purchase money promissory notes executed by Lykes, Mitsubishi and Mitsui executed preferred ships' mortgages in favor of Chase, acting as indenture Trustee for the Shipyards on the Mitsubishi and Mitsui vessels. Although not directly relevant to the matters under consideration at this time, it appears that Lykes also granted, as further security, additional preferred ships' mortgages to Chase on other vessels owned by Lykes.

## III. OWNER PARTICIPATION AGREEMENTS AND BAREBOAT CHARTERS.

By 1986, the container shipping industry was in severe recession. The competition was particularly fierce in the US/Pacific rim area. Lykes had no choice but to discontinue its trans-Pacific trade and was faced with the dilemma of how to utilize the four L-9 Pacific-class vessels.

Lykes was faced with the possibility of being burdened with the Mitsui financing arrangement, under which Lykes was required to pay 28 billion Japanese yen over 15 years, equivalent to an obligation of $198 million in U.S. dollars, or $47 million per vessel, an amount that was $6 million per vessel higher than the actual construction price. Lykes was forced to find a use for the Pacific-class vessels and had two alternatives: (1) to sell them and remove itself from the transaction completely, or (2) to find an economically sound financing arrangement under which Lykes could retain its interest in the vessels, yet live with the terms of the financing arrangement. The first alternative was out of the question since all four vessels were burdened by preferred ships' mortgages in favor of Mitsui and Mitsubishi, which secured an indebtedness far in excess of the

original construction price, and also, far in excess of the actual value of the vessels. Moreover, these vessels were already under charter with APL, as will be discussed later, who had an option to renew the original three-year term three times, for a total of nine years. Additionally, these vessels were U.S. flag vessels and had the benefit of an operating differential subsidy granted by the U.S. Maritime Administration. Only APL was qualified to obtain similar benefits. Further, APL had enough volume to fully utilize the shipping capacity of these vessels.

Lykes decided that the only sensible solution to this dilemma was to obtain financing. One of the entities Lykes approached in early 1987 was Drexel Burnham Lambert Incorporated (Drexel Burnham) which agreed to explore the possibility of financing the four L-9 vessels built by Mitsui and Mitsubishi. There is no question that at the time the Blue Water transaction started to be negotiated, Lykes already owned the Pacific-class vessels subject, of course, to the preferred ships' mortgages of Mitsui and Mitsubishi. There is evidence in this record to indicate that the parties were aware that Mitsui and Mitsubishi had to consent to the financing, and counsel for Drexel Burnham specifically advised Mitsui and Mitsubishi that in the event Lykes filed for bankruptcy protection, the Bankruptcy Court could view a possible sale-leaseback arrangement as a method of financing the construction of the vessels and Blue Water as a secured lender, citing as authority for that proposition *In re PCH Associates*, 804 F.2d 193 (2d Cir.1986).

The heart of the controversy is the interpretation of the documents evidencing the transaction between Lykes and Blue Water concerning the four Pacific-class vessels chartered by Lykes to APL. The basic Agreements, each of which covered a separate vessel, are entitled "Bareboat Charters," and were entered into by Lykes with Blue Water on July 30, 1987, after the Pacific-class vessels were already chartered to APL. The principal features of these Agreements are as follows:

(1) Lykes agreed to convey to the Trustee for the benefit of Blue Water record title to the Pacific-class vessels;

(2) Blue Water agreed to charter back those vessels under a long-term charter arrangement to Lykes;

(3) Lykes was granted an option to repurchase the vessels; and

(4) Blue Water agreed to assume without recourse the underlying mortgage debt owed to Mitsubishi and Mitsui and agreed to lend to Lykes approximately $14.2 million plus simple interest calculated at the rate of 7.59% per annum, which amount was to be paid by Blue Water to Lykes in five annual installments from 1987 to 1992. The purchase price fixed in the Agreements for the Pacific-class vessels was established at approximately $205 million, for an average of more than $51 million per vessel including the assumption of the principal balance of the Mitsui and Mitsubishi purchase money notes of approximately $27 billion yen or more than $190 million U.S. dollars at the then prevailing exchange rate.

As part of the transaction, the parties also executed a number of additional documents including an "Owner Participation Agreement" dated June 30, 1987, between Meridian as Trustee, Blue Water, Lykes and InterOcean. This document was designed to effectuate transfer of ownership of the Pacific Class vessels to Meridian as trustee for the benefit of Blue Water. (Ex. A to Lykes' Counterclaim and Cross–Claim). The Agreement further provided that Lykes was required to make 178 monthly payments for each vessel to Blue Water which was calculated to match the precise amount of the underlying-yen denominated mortgage debt owed to Mitsui and Mitsubishi.

The Agreement further provided that beginning in the 179th month and continuing through the end of the charter period, Lykes had two options: (1) to continue making the $12,500 daily charter payment for each vessel until the end of the charter period, that is the year 2007, or $4,562,500 per year per vessel, for a total of $91 million in charter payments; or (2) to exercise the right to purchase, at the end of the initial 178th month of the charter by Meridian to Lykes and at stated annual intervals thereafter, including at the end of the 238th month, one or more of the Pacific-class vessels for a termination value of the

greater of $44.4 million dollars or the fair market value of the vessels.

The Agreement also contained the following provisions: first, it provided that if any of the Pacific-class vessels was declared a total loss or if title to the vessels was requisitioned by the government, Blue Water had the right to reconvey ownership of the vessels to Lykes upon payment by Lykes of a stipulated loss amount which had two components: (1) full payment of the balance on the Mitsubishi and Mitsui notes; and (2) a payment by Lykes to Blue Water. The Agreements further provided that, absent a total loss of the vessels, or any one of them, or a requisition by the U.S. government of the title to the vessels, or any one of them, Lykes was obliged either to exercise its option to purchase the vessels or continue to make the charter payments for the remaining years under the Agreements. Lykes did not have the option to purchase the vessels during the first 178 months of the Agreements and Lykes had no right to terminate the Agreements during its first 178 months, nor thereafter, unless it exercised its option to purchase.

In addition, Lykes also entered into various other agreements under which Lykes was required to make 178 monthly payments to Blue Water in the precise amount of the underlying yen-denominated mortgage debt which was due and payable to Mitsui and Mitsubishi which, as noted earlier, was assumed without recourse by Blue Water through its trustee, Meridian. Lykes also agreed to indemnify Blue Water against any adverse tax consequences which might be visited upon Blue Water as the result of the Agreements. (Exh. B to Lykes' Counterclaim and Cross–Claim).

As part of the transaction with Blue Water, Lykes executed a "collateral mortgage note" in the amount of $61,747,414.00. This was a bearer note, payable at 4% per annum until paid. It was payable at the offices of Meridian, the Trustee for Blue Water's interest. Under the note, Lykes also obligated itself to pay attorneys' fees if it was necessary to engage the services of an attorney to collect the note at the fixed rate of 10% of

the amount due and sued for. To secure this collateral mortgage note, Lykes also executed a "collateral ship mortgage" and a "collateral chattel mortgage." It should be noted that in order to secure the collateral mortgage note, Lykes mortgaged to the holder of the note the M/V PRESIDENT ARTHUR, one of the very vessels which was allegedly transferred to Blue Water as a result of which Blue Water became the owner of the vessel which was then "leased back" to Lykes, a legally incongruous proposition indeed because it is axiomatic that one cannot hold a mortgage on the very property that is owned.

At the time of the Blue Water transaction, Lykes was indebted to the Bank Group led by Chemical Bank, in the amount of approximately $25 million. As part of the Blue Water transaction, Chemical Bank agreed to partially subordinate its lien on the accounts receivables of Lykes in favor of Blue Water. Of course, subordination by its very nature involves a legal proposition whereby one agrees to subordinate its secured position to the secured position of another, and this Court is not aware of any transaction which involves subordination when a secured creditor subordinates its rights to an ownership interest.

Under the Owner Participation Agreement, Blue Water was to advance toward its "equity" in the vessels, the sum of $14,170,-564.00. Out of this amount, a total of $1 million was paid at closing. There was an additional escrowed amount in excess of $1 million and the balance of the so-called purchase price was retained by Blue Water, secured through Blue Water's deferral and set-off rights of Lykes' obligations to Blue Water. The $1 million cash payment was used to pay professional fees; Lykes received nothing at closing. The balance of the payment consisting of $1,023,529.00 was placed in escrow and out of that, $200,000 was transferred to an additional escrow account so that ultimately Lykes ended up with a balance of $800,000.00. The total investment of Blue Water in 1987 in this transaction was $2 million, for which Blue Water claimed an investment tax credit of more than $12.8 million, which permitted Blue Wa-

ter partners to deduct dollar-for-dollar the amount of $12.8 million to be paid as so-called purchase price for the vessels from their federal income tax returns.

As part of the transaction, the parties also entered into a "Tax Indemnity Agreement" under which Blue Water was guaranteed that it would realize a "net economic return" which was defined as its "after-tax rate of return" on its investment. The Tax Indemnity Agreement required Lykes to guarantee that it would pay Blue Water any amounts necessary for Blue Water to maintain its net economic return. Lykes even indemnified Blue Water for any increase in the federal income tax rates, an event over which Lykes obviously had no control.

Thus, under the Agreements, the total amount invested by Blue Water was $14.2 million paid over five years between 1987 and 1992. In turn, Blue Water was to receive at least $44.4 million by the year 2002 if Lykes exercised its option to purchase at that time. If Lykes did not exercise the option, Blue Water would receive, until the year 2007, some $12,500 per day per vessel or $4,562,-500 per year per vessel for, under this scenario, a total of $91 million in charter payments.

Basically, these are the relevant facts which, according to Lykes, would support its contention that the Owner Participation Agreement and Bareboat Charters collectively created a financing transaction and not a true lease or charter; therefore, Lykes is still the owner of the four Pacific-class vessels currently under charter to APL. Based upon these facts, both Lykes and Blue Water contend they are entitled to a ruling on the issue, i.e., the legal nature of the transaction—lease v. purchase—in their respective favors as a matter of law.

## IV. GOVERNING LAW.

There are essentially three potential sources of non-bankruptcy law which may be applicable for a proper analysis and characterization of the Blue Water transaction. The first and most obvious would be federal maritime law; the second is the applicable law of the state, in this instance the State of New York, which the parties agreed applies

and governs the interpretation of the documents relevant to the issues under consideration; and lastly, the law of the state where Lykes maintains its principal place of business, that is, in Florida. Based on the parties' agreement, as evidenced by paragraph 15 of the Owner Participation Agreement which is Lykes' Exhibit A, this Court is satisfied that the laws of the State of New York shall apply to construe the Blue Water transaction, especially since section 671.105 of the Florida Statutes (1995) recognizes the parties' right to determine the choice of law. *See, e.g., Citi–Lease Co. v. Entertainment Family Style, Inc.,* 825 F.2d 1497 (11th Cir. 1987).

## V. CHARACTER AND CONTROLLING FEATURES OF TRUE LEASES.

 It should be noted at the outset that it is a well-accepted and established proposition that the record title itself is not conclusive as to ownership of a vessel. *Interpool, Ltd. v. Char Yigh Marine (Panama) S.A.,* 890 F.2d 1453, 1460 (9th Cir.1989); *see, e.g., Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht, Hull Number 01,* 625 F.2d 44 (5th Cir.1980); *The Kitty C.,* 20 F.Supp. 173 (S.D.Fla.1937). The structuring of a financing arrangement in the shipping industry is not novel and the vehicle of a bareboat charter was frequently used as part of a financing transaction. As noted by the Ninth Circuit, such arrangement has been a common method of ship financing since World War II. *Interpool supra.* While one must concede that the maritime adaptation of a tripartite agreement poses a great many questions, in the last analysis, one must view the transaction not only in a pure pragmatic and technical legal point of view but also by taking into account all the economic factors which drove the transaction and which were the prime impetus to the ultimate decision to enter into the transaction and the reasons for structuring the transaction as it was done. There is nothing in federal maritime law which provides a good answer to the question, but courts have taken the approach of the Uniform Commercial Code as indicative of the federal common law of admiralty and for this reason, frequently looked to state law to fill this admittedly existing gap in maritime law.

*E.g., Bank of America N.T. & S.A. v. Fogle,* 637 F.Supp. 305 (N.D.Cal.1985).

New York adopted the Uniform Commercial Code (UCC) and the statutory provisions in effect at the time of the Blue Water transaction provided:

### U.C.C. § 1–201(37)

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (§ 2–401) is limited in effect to a reservation of a security interest.... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

### U.C.C. § 9–102(1)

Except as otherwise provided ..., this chapter applies:

(a) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, or accounts.

### U.C.C. § 9–102(2)

This chapter applies to security interests created by contract including ... lease ... intended as security.

### U.C.C. § 9–202

Each provision of this chapter with regard to rights, obligations, and remedies applies whether title to collateral is in the secured party or in the debtor.

N.Y.U.C.C. §§ 1–201(37), 9–102(1), 9–102(2) and 9–202 (1993 and Supp.1995). It is noteworthy that the statutory provisions quoted are virtually identical to the standards established by § 101(50) of the Bankruptcy Code

itself concerning true leases. The legislative history of that section states:

> Whether a "lease" is a true or bona fide lease or, in the alternative, a financing "lease" or a lease intended as security, depends upon the circumstances of each case. The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of the title, the form of the transaction or the fact that the transaction is denominated as a "lease."

S.Rep. No. 989, 95th Cong.2d Sess. 64 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5850.

The courts utilizing New York law to resolve this question generally applied a two-fold test: first, if the so-called lessee has an option to become an owner for no additional consideration or for nominal consideration upon completing the lease terms, the so-called lease is *conclusively* deemed to be a financing transaction. If that has been established, the court's inquiry ends. *National Equipment Rental, Ltd. v. Priority Electronics Corp.*, 435 F.Supp. 236, 238 (E.D.N.Y. 1977). However, if a court finds that the price required to exercise the option is not nominal, the court would then consider other factors, and most importantly "the economic substance" of the transaction. Courts have adopted a number of tests to determine whether the option to purchase is nominal and if the option price meets any of these tests, it has been regarded as nominal:

a. Token or No Additional Consideration. A one dollar option is nominal. *E.g., In re Ram Mfg., Inc.*, 56 B.R. 769 (E.D.Pa.1985); *In re All American Mfg. Corp.*, 172 B.R. 394, 398 (Bankr.S.D.Fla.1994).

b. Nominal Compared to the Total of Rental Payments. *Matthews v. CTI Container Transport Int'l., Inc.*, 871 F.2d 270 (2d Cir.1989).

c. Nominal Compared to the Original Purchase Price or List Price. *E.g., In re AAA Machine Co.*, 30 B.R. 323 (Bankr. S.D.Fla.1983).

d. Nominal if the "Lessee" is Left with "No Sensible Alternative But to Exercise the Option." *E.g., In re Oak Mfg., Inc.*, 6 U.C.C.Rep.Serv. (Callaghan) 1273, 1277 (Bankr.S.D.N.Y.1969); *In re Vaillencourt*, 7 U.C.C.Rep.Serv. (Callaghan) 748, 761–762 (Bankr.D.Me.1970).

e. Nominal Compared to Fair Market Value at the Time of Exercise. *E.g., In re Beker Industries Corp.*, 69 B.R. 937, 940 (Bankr.S.D.N.Y.1987).

One must concede at first blush, that the option price fixed by the Blue Water Agreements was facially not nominal at all, in that in order to exercise the option, Lykes was required to pay Blue Water the greater of the fair market value of the vessels or $44.4 million dollars. If this provision is viewed in a vacuum and any other surrounding provisions are disregarded, one might conclude that this is a true lease with an option to purchase. It is without dispute that under the Agreements, Lykes was required to pay to Blue Water over the full term of the charter period the total amount of $430 million dollars, comprised of the following components: (1) rental payments of 42.8 billion yen during the first fifteen years of the charter, which equates to the approximate amount of $3.29 million U.S. dollars at the exchange rates which existed in July, 1987, and (2) the rental payments totalling $91 million in U.S. dollars that Lykes was required to pay for years fifteen and beyond to the end of the term, i.e., between 2002 and 2007. In comparison, Lykes had the right to purchase the Pacific-class vessels in the year 2002 for the greater of $44.4 million or the fair market value. The original construction price per vessel was $41 million.

While the evidence presented indicates several different values on different dates, it is clear that at the end of the lease term, the vessels had, in terms of economic residual value, at least 20% of their appraised value. After the use of these vessels for fifteen years, the vessels were valued at $11.1 million each for a total of $44.4 million. Clearly, Lykes had nothing but a Hobson's choice to either purchase the vessels by exercising the option and paying the greater of $44.4 million or the fair market value in the year 2002, thus relieving itself of the requirement to make charter payments for the remaining five years, or to continue making the charter

payments up to the year 2007 which would total $91 million. The net effect of exercising the option in year 2002 is that by prepaying the rent and using that savings, Lykes in fact doesn't have to pay any additional consideration for the purchase of the vessels.

The situation under consideration here is very similar to the factual scenario in *In re Vaillencourt*, 7 U.C.C.Rep.Serv. (Callaghan) 748 (Bankr.D.Mo.1970). where the debtor had the choice in December 1973 of paying $147.25 to become the owner of certain equipment or to lease it for an additional year by paying $204.80. As the court noted, "[t]he choice between the two alternatives does not seem difficult. In the event the equipment was worth leasing at all, it would seem only sensible to pay the lesser sum to become its owner rather than the larger sum merely for the privilege of using it for another year." *Id.* at 762. As a matter of common sense and sound economics, it would have made no sense for Lykes to pay $91 million in rent for the five years following the year 2002, when it could purchase the vessels in the year 2002 for the greater of their fair market value or $11.1 million each. The evidence of whether or not these vessels collectively had a market value greater than $44.4 million in the year 2002 is conflicting. According to the affidavits submitted by Lykes, the value of these vessels in the year 2002 would be low, especially in light of their age and because Lykes' operating differential subsidy, provided by the United States and the Maritime Subsidy Board pursuant to 46 U.S.C. § 1171, was scheduled to expire in 1997. Without this subsidy, U.S. flag vessels bore high operating costs due to the requirement, among others, that a U.S. crew be utilized. That fact no doubt would have caused a substantial negative impact on the ultimate success of Lykes' continuing operation in the trans-Pacific arena.

Assuming for purposes of discussion, without conceding, that the option price was more than nominal, this does not end the inquiry and the Court must still look to a number of other factors which are indicative of the true nature of the Blue Water transaction. Other courts faced with that issue generally consider the following:

(1) Which party bore the risk of loss during the term of the lease. *See, e.g., Orix Credit Alliance, Inc. v. Pappas*, 946 F.2d 1258 (7th Cir.1991); *Credit Car Leasing Corp. v. DeCresenzo*, 138 Misc.2d 726, 525 N.Y.S.2d 492 (N.Y.Civ.1988).

(2) Whether the so-called "lessor" had any input on the selection of the equipment and its purchase. *Orix, supra; National Equipment Rental, Ltd. v. Priority Electronics Corp.*, 435 F.Supp. 236 (E.D.N.Y. 1977); *International Paper Credit Corp. v. Columbia Wax Products Co., Inc.*, 102 Misc.2d 738, 424 N.Y.S.2d 827 (Sup.Ct. 1980).

(3) Which party was required to pay taxes and to maintain the "leased" equipment. *Orix, supra; Matthews v. CTI Container Transport International, Inc.*, 871 F.2d 270 (2d Cir.1989).

(4) Whether the agreement grants to the "lessor" the right to accelerate the rents due over the remainder of the lease term, to sell the collateral, and to hold the "lessee" liable for any deficiency. *Matthews*, and *Credit Car, supra*.

(5) Whether the "lessor" was in the business of leasing. *Matthews, O.P.M.*, and *International Paper, supra*.

(6) Whether the "lessee" was required to be responsible for all liability related to the equipment and to indemnify the "lessor" against all losses. *Matthews* and *Credit Car Leasing, supra*.

(7) Whether the "lessee" was required to maintain insurance on the property. *Orix, Credit Car Leasing* and *International Paper, supra*.

(8) Whether the equipment was custom designed for the "lessee's" use. *In re The Answer—The Elegant Large Size Discounter, Inc.*, 115 B.R. 465 (Bankr. S.D.N.Y.1990).

(9) Whether the equipment would have significant value to other users or, because of the peculiar nature of the equipment or because it was difficult to remove after installation, the equipment would have less value to a subsequent user. *The Answer, supra*.

(10) Whether the "lessee's" payments were not calculated to compensate for use but rather to insure a return on investment. *In re PCH Associates*, 804 F.2d 193 (2d Cir.1986).

(11) Whether the initial purchase price, in a sale/leaseback transaction, was related to the value of the assets. *PCH Associates, supra.*

(12) Whether the transaction was structured as a lease to secure tax advantages. *PCH Associates, supra.*

The Eleventh Circuit, construing the same UCC provisions which apply in New York, similarly considered the following as indicative of a financing transaction because the "lessee" was required to:

(1) insure against risk of loss;

(2) bear the risk of loss yet remain liable for the "rent;"

(3) to indemnify the "lessor" against all liability;

(4) to pay all charges and taxes;

(5) to pay an advance rental or security deposit;

(6) to pay the collection costs and attorneys' fees of the lessor;

(7) to pay all accelerated lease payments upon default.

*Citi–Lease Co. v. Entertainment Family Style, Inc.*, 825 F.2d 1497, 1499–1500 (11th Cir.1987). In *Citi–Lease*, just like in the present instance, the so-called lessor "entered the transaction without any property to lease. Its sole concern was to finance the acquisition of the [equipment] at a profitable return and a minimum of risk." *Id.*

In the case of *In re Tillery*, 571 F.2d 1361 (5th Cir.1978), the Fifth Circuit construed the transaction to be a financing transaction even though there was no option to purchase the leased property in question. The court based its findings upon the "lessee's" obligations to insure, pay taxes, pay license and registration fees, indemnify the "lessor," place a security deposit, and bear all risk of loss. *Id.* New York courts have recognized that the existence of an option to purchase at the fair market value does not necessarily compel the conclusion that the agreement was a true lease, and having considered nu-

merous other factors, have concluded that the arrangements were, in fact, financing transactions. For example, in the cases of *Guardsman Lease Plan, Inc. v. Gibraltar Transmission Corp.*, 129 Misc.2d 887, 494 N.Y.S.2d 59 (N.Y.Sup.Ct.1985) and *National Equipment Rental, supra*, the option provisions were identical to the provision in the Blue Water transaction. In each case, the purported lessee was granted the option to purchase at the higher of a fixed price or the fair market value.

The proposition advanced by Blue Water, that Florida law might apply, of course flies in the face of the specific provision in the Blue Water Agreements, which as noted earlier, clearly specify that the Agreements shall be construed pursuant to the laws of the state of New York. Be that as it may, even if Florida law applies, the results would be the same. There is a plethora of authority to support the proposition that similar transactions have been construed to be financing transactions. *See, e.g., In re All American Manufacturing Corp.*, 172 B.R. 394 (Bankr. S.D.Fla.1994); *In re Howell*, 161 B.R. 285 (Bankr.N.D.Fla.1993); *In re Canaveral Seafoods, Inc.*, 79 B.R. 57 (Bankr.M.D.Fla.1987); *In re Chisholm*, 54 B.R. 52 (M.D.Fla.1985); *In re Associated Air Services, Inc.*, 42 B.R. 768 (Bankr.S.D.Fla.1984); *In re AAA Machine Co.*, 30 B.R. 323 (Bankr.S.D.Fla.1983); *U.C. Leasing, Inc. v. Barnett Bank*, 443 So.2d 384 (Fla. 1st DCA 1983). Although the majority of these cases were decided within the context of a bankruptcy case, nevertheless, the courts applied the applicable state law, in this instance, the laws of the state of Florida. In *U.C. Leasing v. Barnett supra*, the Court considered the following as indicative of a financing transaction:

(1) The lease gave the "lessee" an option to purchase the equipment for a price which was 10% to 15% of the initial price. The court found that this was nominal.

(2) The initial payments, the monthly payments, and the option price were the "equivalent of the making of a down payment, monthly installment payments, and balloon payments as would have been the case in a financing transaction" and the resulting yield to the "lessor" was readily

equated to a current rate of interest in amortization.

(3) The "lessor" was not regularly involved in the manufacture or sale of the equipment. Its business instead consisted of procuring equipment at the instruction of a buyer who had previously made arrangements for the purchase of such equipment at a specific price. The "lessor" did not negotiate the price nor procure the equipment.

(4) The "lessor" does not regularly have inventory available for lease nor facilities not personnel to handle such inventory.

(5) The "lessor" on occasion required a guaranty of payment from third parties, which reflects security anxiety indicative that the lease is actually intended for security.

(6) The remedies of the "lessor" in the event of default are basically the equivalent of the rights and remedies of a secured party under the provisions of Article 9.

(7) The "lessee" was required to pay taxes, procure insurance, maintain and repair the equipment, and bear responsibility for loss and damage.

None of these cases accepted the suggestion that the "fair market value purchase option" was determinative. In the case of *In re KAR Development Associates, L.P.*, 180 B.R. 629 (D.Kan.1995), the district court, reviewing on appeal an unpublished opinion of the bankruptcy court, stated:

This court concludes that the legislative history of § 502(b)(6), read together with § 365, shows Congressional intent that an economic realities test be used to determine whether a real estate transaction should be characterized as a lease. This, coupled with the interest in fulfilling bankruptcy purposes and objectives, provides an adequate "federal interest" to justify using a federal rule rather than a state law to define this particular property interest.

*Id.* at 638.

Blue Water also urged this Court to reject application of the governing principle as enunciated by some courts and referred to as the "pragmatic test," contending that the

decisions in this Circuit recognizing this test did so only in dicta, and the test is contrary to well-established precedents. This is not quite a correct statement of the law. In the Eleventh Circuit, in the case of *In re Martin Brothers Toolmakers, Inc.*, 796 F.2d 1435 (11th Cir.1986), the court considered a transaction within the context of the applicability of § 365 of the Bankruptcy Code, a section which deals with assumption and rejection of executory contracts. In *Martin Brothers,* the Eleventh Circuit indicated that if a particular agreement is not unduly burdensome or is especially advantageous, it should not be construed as an agreement that is subject to § 365. *Id.* at 1439. While it is true that the Eleventh Circuit did not utilize the pragmatic test, that court's recognition of this rule is indicative and should be accorded great weight although it is technically not binding. One would be less than candid not to concede that application of the pragmatic test was not designed to benefit lessors but designed to promote rehabilitation and benefit the debtor and all of the creditors involved in the case.

In support of its position, Blue Water urges and advances a number of different propositions, such as that the documents constantly refer to Blue Water's interest as one of "ownership;" next, that Blue Water received an "independent" appraisal; third, that the Agreements required that Blue Water be treated as the owner for tax purposes; fourth, subsequent "confirmation" of such tax treatment by the IRS; fifth, the fact that GATX and Gilman, two parties of Blue Water, are claimed to be in the leasing business, and have treated similar transactions like thousands of other leases; next, that Lykes admittedly did not treat itself as owner of the L–9 vessels for tax and accounting purposes; seventh, that Lykes never operated the L–9 vessels itself; eighth, the fact that Blue Water borrowed funds and obtained financing to enter into the transaction; and ninth, Lykes invested no equity into the L–9 vessels.

Without giving short shrift to these contentions, it will suffice to say that this Court is not only in disagreement with the factual premises asserted by Blue Water, but also the legal conclusions drawn from those facts.

Without discussing them in detail, it is sufficient to point out that the characterization of the transaction by Blue Water is obviously not controlling and just as the label placed on the transaction is not controlling, and the fact that Blue Water obtained an independent appraisal is a total non sequitur. One would be naive to assume that a financier would enter into a transaction involving millions of dollars without obtaining an independent appraisal of its collateral. The tax provision relied on by Blue Water is equally non persuasive. The advisory committee note to UCC 9–202 states:

> [I]f a revenue law imposes a tax on the "legal" owner of goods ... this Article does not attempt to define whether the secured party is a "legal" owner or whether the transaction "gives" a security interest for the purposes of such laws. Other rules of law or the agreement of the parties determine the location of "title" for such purposes.

UCC § 9–202. The fact that the transaction transfers investment tax credits and depreciation rights to a third party under the tax code, does not automatically signify transfer of ownership for purposes of the UCC or the Bankruptcy Code. *In re Chateaugay,* 102 B.R. 335 (Bankr.S.D.N.Y.1989). Lastly, the fact that GATX and Gilman are allegedly leasing companies has clearly no bearing on the intent of the parties. This is especially true, because GATX and Gilman are actually johnny-come-latelys to this transaction, having replaced the original partners of Blue Water long after the transaction was already structured and effectuated. The original lenders were Drexel Burnham and GECC. Drexel Burnham was never in the leasing business, it is a brokerage firm which ultimately landed in Chapter 11 itself. GECC is a secured lender who was, in fact, then a secured creditor of Lykes. The lead party to the transaction, Blue Water, was a newly-formed entity with no financial resources, no other leases in its portfolio, and clearly had never been nor intended to engage in the shipping business. It is illuminating to note the comments of another bankruptcy court on the business of GATX:

> In his deposition, the vice president of GATX testified that "we are in the business of asset-based financing, and basically we seek security." It is not difficult to infer an attempt to create a security transaction based on this statement.

*In re Eureka Southern Railroad, Inc.,* 72 B.R. 813 (Bankr.N.D.Cal.1987).

The balance of the propositions urged by Blue Water, such as the allegation that Blue Water obtained financing for the purchase of the L–9 vessels, is not true. The purchase of the L–9 vessels was financed by Mitsui and Mitsubishi and not by Blue Water. The fact that the lessor used its own money or borrowed money is without significance. The allegation that Lykes invested no funds in the L–9 vessels is equally untrue. Lykes paid $22.7 million in deposits, made several monthly debt service payments and carried a $300,000 monthly shortfall in payments to Mitsui and Mitsubishi for years. Considering the totality of the picture, this Court is constrained to conclude that the transaction under scrutiny was, in fact, a financing transaction and not a bona fide sale by Lykes to Blue Water of the L–9 vessels.

In sum total, having considered all the factors relevant, which are recognized by courts generally in determining whether a particular transaction is a true lease or a financing agreement, and considering the facts which are really indeed without dispute in this case, including the relevant documentary evidence, this Court is satisfied that, in fact, there are no genuine issues of material facts and the Debtor, Lykes, is entitled to resolve this controversy in its favor as a matter of law. This determination is based on the conclusion that the Owner Participation Agreement and the Bareboat Charters were, as a matter of law, not leases at all but financing arrangements and, therefore, the ownership interest remained in Lykes and the four Pacific-class, L–9, vessels are still owned by Lykes. This conclusion has no bearing or relevance whatsoever on the rights of Mitsui or Mitsubishi and has no reflection or determination of anybody else's interest, if they have any, on the L–9 vessels.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Debtor's Motion for Sum-

mary Judgment as to Counts I and II of the Counterclaim and Cross–Claim is granted. It is further

ORDERED, ADJUDGED AND DECREED that the Blue Water Parties' Motion for Summary Judgment as to Counts I and II of the Counterclaim and Cross–Claim is denied. It is further

ORDERED, ADJUDGED AND DECREED that Lykes is the record title owner of the four Pacific-class, L–9 vessels known as the M/V PRESIDENT ARTHUR (Official No. 695901), M/V PRESIDENT BUCHANAN (Official No. 697633), M/V PRESIDENT GARFIELD (Official No. 905624), AND M/V PRESIDENT HARDING (Official No. 909326). A separate Partial Final Judgment will be entered in accordance with this Order.

DONE AND ORDERED.