Nicholas Todd SUTTON,
Plaintiff–Appellant,

v.

Jewel Angela Sutton DAVIS,
Defendant–Appellee.

Court of Appeals of Tennessee,
Eastern Section.

Sept. 29, 1995.

Application for Permission to Appeal
Denied by Supreme Court
Jan. 29, 1996.

Nicholas Todd Sutton, Pro Se.

David L. Buuck, Knoxville, for appellee.

### OPINION

GODDARD, Presiding Judge.

The Plaintiff, Nicholas Todd Sutton, incarcerated in the penal system of this State for the murder of his grandmother who was the mother of his aunt, the Defendant, Jewel Angela Sutton Davis, sues Ms. Davis for alleged wrongs incident to a real estate transaction. His complaint, as amended, seeks recovery on the theories of breach of contract, conversion, promissory fraud, and negligent misrepresentation.

The Trial Court dismissed the suit on the grounds that the claims were barred by the applicable statute of limitations and laches. He appeals contending the Trial Court's action in this regard was error.

Although the motion was to dismiss and the order was an order of dismissal, because affidavits were introduced by both parties we must treat the motion and the order entered thereon as one for summary judgment. Rule 12.02, Tennessee Rules of Civil Procedure.

The standard of review of such motions is restated in the recent Supreme Court case of *Byrd v. Hall,* 847 S.W.2d 208, 214 (Tenn.1993), as follows:

Rule 56 comes into play only when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Thus, the issues that lie at the heart of evaluating a summary judgment motion are: (1) whether a *factual* dispute exists; (2) whether the disputed fact is *material* to the outcome of the case; and (3) whether the disputed fact creates a *genuine* issue for trial.

Upon applying the mandates of *Byrd,* we find in the affidavits of the parties that there is a factual dispute.

### MR. SUTTON'S FIRST AFFIDAVIT

1. That I am the plaintiff in the above-styled cause.

2. That on November 9, 1979, I entered into a written agreement with the defendant in this matter, Jewel Angela Sutton Davis (Jewel), in which I agreed to sell to her thirty (30) acres of land located in North Carolina.

3. That I agreed to sell thirty (30) acres of land to Jewel, for the amount of Forty Thousand Dollars ($40,000.00). The land was my land, duly deeded to me. I entered into the agreement with Jewel at her insistence. Once she learned of my acquisition of the property, she adamantly sought to purchase the land from me.

4. I had numerous opportunities to sell the thirty (30) acres of land for one lump sum of Forty Thousand Dollars ($40,-000.00). However, I agreed, at Jewel's request, to sell her the land on an installment plan. Jewel requested that we make our agreement on an installment plan so

that she would not have to take out a mortgage or large loan to pay the one lump sum of Forty Thousand Dollars ($40,-000.00). I agreed to these terms at Jewel's request.

5. That our written agreement was entered into by Jewel and myself at the home and residence of Jewel. The terms of our agreement were explicitly stated in the agreement. I agreed to sell Jewel thirty (30) acres of land for Forty Thousand Dollars ($40,000.00). Jewel agreed to pay me Four Thousand Dollars ($4,000.00) per year for ten (10) years for the thirty (30) acres of land until the agreed upon price of Forty Thousand Dollars ($40,-000.00) was paid to me in full. We both signed the agreement, and it was then witnessed by two of Jewel's friends who were also at Jewel's home. Jewel kept the original agreement and, the following day, she gave me a copy of our agreement. She then advised me that she was going to place the original agreement in a "safe place." I placed my copy among the rest of my personal papers and belongings inside a desk in my bedroom at my grandmother's house.

6. That Jewel paid me the first installment of Four Thousand Dollars ($4,000.00) over a period of approximately one (1) month, between October 24th and November 23rd, 1979.

7. On December 28, 1979, I was taken into custody concerning an unrelated criminal proceeding. That at the time I was taken into custody, all of my personal possessions, papers, etc., were located in my desk and in various other locations in my bedroom at my grandmother's house. My copy of our agreement was stored inside my desk at the time I was incarcerated. I have been in custody continuously since that date. However, after I was incarcerated, Jewel took possession of and in fact confiscated all of my property and other belongings located in my bedroom. My copy of our land agreement was among my belongings taken by Jewel.

8. After the date I was incarcerated, I made numerous attempts to contact Jewel by telephone and by letter. However, Jewel refused to accept any of my telephone calls and never responded to any of my letters.

9. That in or about October, 1987, I received a visit at the Tennessee State Penitentiary in Nashville, where I was confined, from Loretta Adella Sutton (Loretta). Loretta advised me that she was there to see me on behalf of Jewel. Loretta advised me that she was sent by Jewel in order to discuss the Thirty Six Thousand Dollars ($36,000.00) still owed to me by Jewel. Loretta advised me that Jewel had opened a trust fund account for me in the amount of Thirty Two Thousand Dollars ($32,000.00). Loretta then advised me that she would be back in touch with me concerning my access to the trust fund account, as soon as she talked with Jewel. However, I have not received any further communication from Loretta.

10. That since the date of my incarceration, I have made numerous other attempts to contact Jewel by telephone and by letter. I have made these attempts in order to be compensated by her for the remaining Thirty Six Thousand Dollars ($36,000.00) that she currently owes me under the terms of our agreement. However, all of my attempts have been unsuccessful.

11. That Jewel totally refuses to make any contact with me and, consequently, refuses to pay me the rest of my money under the terms of our agreement.

### PORTIONS OF MR. SUTTON'S SECOND AFFIDAVIT THAT DIFFER FROM HIS FIRST

4. That Jewel induced me to sell her the aforesaid land for Four Thousand Dollars ($4,000.00) in cash and an additional Four Thousand Dollars $4,000.00) to be paid each year for ten (10) years until the agreed upon price of Forty Thousand Dollars ($40,000.00) was paid to me in full.

5. On November 9, 1979, believing the statements of Jewel to be true about the

amount of money that she would pay me and would continue to pay me for the land, and relying upon the statements that she made to me, I agreed to sell her my property for Forty Thousand Dollars ($40,000.00).

6. To induce me to sell her my aforesaid land, Jewel falsely and fraudulently told me that she would soon be receiving a large amount of money from a real estate closing on property that she owned and was selling in North Carolina. Jewel in fact told me that after she closed the deal on the property that she was in the process of selling in North Carolina, she would start making the payments to me and would in fact pay me because she would be financially secure and would then be in a position to pay me the money that she owed me for the land, and she would be able to make all the payments to me without taking out a mortgage.

7. I relied upon the false and fraudulent statements made to me by Jewel, believed the things that she told me about receiving a large amount of money to be true, and I would not have under any circumstances agreed to sell my land to her if I had known that she was not telling me the truth or that any of her statements to me were false and untrue. However, I did not learn that her statements were in fact false and untrue until on or about July 20, 1993.

8. That Jewel made the false and fraudulent statements to me in order for her to trick me into selling her the aforesaid land. Jewel had no intention at the time she made the statements to me, or at any time at all, of selling her land in North Carolina, or of actually paying me the money that she told me that she would pay me if I would sell her my land. I believed that she would pay me and relied on the statements she made to me. However, she has not paid me the money she owes me and in fact falsely and fraudulently obtained my property and thereby damaged me as a result.

### MS. DAVIS' AFFIDAVIT

My name is Jewel Davis and I am the Defendant in the above styled lawsuit. I have firsthand knowledge of the facts stated herein and I am over the age of eighteen (18) years.

I purchased the property at issue in this lawsuit from Nicholas Todd Sutton for the sum of Four Thousand Five Hundred Dollars ($4,500.00). At no time did I ever agree to or promise to pay Nicholas Todd Sutton the sum of Forty Thousand Dollars ($40,000.00), nor did I promise to pay him Ten Thousand Dollars ($10,000.00) per year, nor did I in any way make any misrepresentation to him.

■ While it is clear that there are disputes as to certain facts, there are none relating to the statute of limitations as to most of the claims. We accordingly conclude that the Trial Court was correct in finding the applicable statute of limitations barred all claims of Mr. Sutton except as to payments due within six years of filing his original complaint on May 7, 1993.

The Plaintiff's affidavits indicate that the debt was to be paid in 10 installments of $4000 each. His first affidavit refers to the payment of $4000 made "between October 24th and November 23rd, 1979" as the "first installment." According to the affidavits, that initial installment payment was due within the first year of the loan, i.e., on or before November 9, 1980. The next nine installments, again according to the Plaintiff's affidavits (which, under *Byrd*, we must take as true), were due on or before November 9 of each year from 1981–1989. Therefore, the payments due on or before November 9, 1987, 1988, and 1989, are not barred by the statute of limitations.

The final question to be resolved is whether laches barred even those claims.

■ Some jurisdictions hold that "the doctrine of laches is equitable in character and may not be invoked in a law action." *Perkins v. City National Bank of Clinton*, 253 Iowa 922, 114 N.W.2d 45 (1962). In our jurisdiction, however, the rule is otherwise. This Court, in *Jansen v. Clayton*, 816 S.W.2d 49 (Tenn.App.1991), speaking through Judge

Cantrell, held that laches may also bar purely legal claims.

■ Next we must determine whether a claim not statutorily barred may be subject to the defense of laches.

In *Consumer Credit Union v. Hite,* 801 S.W.2d 822, 825 (Tenn.App.1990), Judge Tomlin, in quoting with approval from Tennessee Jurisprudence, addresses the general doctrine and specifically this question, which he answers in the affirmative:

Defendant's contention that the trial court erred in failing to apply the doctrine of laches is also without merit. The doctrine of laches is well summarized in 11 Tenn. Jurisprudence, *Equity,* § 39 at p. 44:

The two essential elements of laches are negligence and unexcused delay of the complainant in asserting his alleged claim and injury to rights of third persons intervening during and therefore on account of the delay. Thus, the determinative test as to laches, which may be available as a successful defense in an equitable action, is not the length of time that has elapsed, but whether the party relying on laches as a defense has been prejudiced by the delay. Ordinarily, laches will bar equitable remedies where delay works prejudice to a party, such as changed conditions in the premises, expenditure of money, change of value, and intervening rights. Factors to be considered with respect to the defense of laches are whether the defendant was prejudiced by the delay, whether evidence once available to the defendant is no longer available, and whether the defense has been lost by reason of the delay. However, each case in which the defense of laches is interposed must be determined upon its own facts.

Laches is a defense peculiar to courts of equity, and the doctrine is usually applied where no statute of limitations governs. However, on occasion, the doctrine is applied to bar a stale claim prior to the statute of limitations; but it should be applied in such cases when there is gross laches in the prosecution of the claim. *Clark v. American National Bank & Trust Co.,* 531 S.W.2d 563 (Tenn.App.1974).

*Clark,* cited by Judge Tomlin, as well as *State ex rel. v. Abernathy,* 159 Tenn. 175, 17 S.W.2d 17 (1929), and *Carpenter v. Wright,* 158 Tenn. 289, 13 S.W.2d 51 (1929), recognized that laches may bar a claim before the running of the applicable statute of limitation. All of these cases, however, also require—as is the general rule—that prejudice be shown.

In the case at bar there is no showing of prejudice in bringing suit as to the three payments Mr. Sutton claims to be due in November of 1987, 1988, and 1989. Thus, we do not believe the Chancellor may be sustained on the ground of laches as to these payments.

In conclusion, we emphasize that we are not finding that Mr. Sutton in fact has a valid cause of action (such a determination must await a hearing on the merits), but merely that the defense of laches is not available to Ms. Davis under the present state of the record.

For the foregoing reasons the judgment of the Trial Court is affirmed in part, vacated in part, and the cause remanded for proceedings not inconsistent with this opinion. Costs of appeal are adjudged one-half to Mr. Sutton and one-half to Ms. Davis.

FRANKS and SUSANO, JJ., concur.