In re PACIFIC EASTERN
CORPORATION,
Debtor.

PACIFIC EASTERN CORPORATION
and Harpeth Village Development
Company, Plaintiffs,

v.

GULF LIFE HOLDING COMPANY; Gulf Life Insurance Company; Gulf United Corporation; Gulf Mortgage & Realty Investments; GMR Properties; Grubb & Ellis; Manufacturers Hanover, Corporation; Manufacturers Hanover Trust Company; ITR Properties, Inc.; Chemical Banking Corporation; Chemical Bank; and American General Corporation, Defendants.

Bankruptcy No. 397-01768-AT-11.
Adversary No. 397–0239A.

United States Bankruptcy Court,
M.D. Tennessee.

Aug. 13, 1998.

Robert M. Garfinkle, Garfinkle, McLemore & Walker, PLLC, Nashville, TN, for Plaintiffs.

Sam J. McAllester, III, Thomas R. Dyer, Paige Waldrop Mills, Wyatt, Tarrant & Combs, Nashville, TN, for Chase Manhattan Bank and ITR Properties, Inc.

Marc Thomas McNamee, Neal & Harwell, Nashville, TN, for Charles Whittemore.

## MEMORANDUM

ALETA ARTHUR TRAUGER, Bankruptcy Judge.

The court has before it an action based on an alleged violation of the Tennessee usury statute that was filed originally in state court and then removed to federal court after the debtor's bankruptcy filing. Plaintiffs assert that a $250,000 sale-leaseback and a $1.4 million loan, when combined, are a disguised loan for $1.65 million by which defendants have collected usurious interest. The only remaining defendants, Chase Manhattan Bank and ITR Properties, Inc., argue that the lease is a true lease that ought not be considered a part of the loan and that, therefore, the transaction is not usurious. Defendants also assert that plaintiffs' action is barred by laches and barred because defendants are holders in due course. The court finds that plaintiffs' action, which was filed more than twenty-one years after the closing of the transaction, is barred by laches.

## I

### Factual Background

In early 1970, Charles Whittemore, the president and sole owner of Harpeth Village Development Company (Harpeth) in Nashville, approached Gulf Life Insurance Company, which had offices in Jacksonville, Flor-

ida, about securing a loan to build a hotel on some three acres of land owned by Harpeth at the intersection of Interstate 65 and Harding Place in Nashville. The entity which was to actually borrow the money and develop the hotel was Pacific Eastern Corporation (Pacific Eastern), 37.5 percent of which was owned by Whittemore. The other owners were Dr. Arthur Anderson of Nashville, who owned 37.5 percent and Rod Laver, the tennis figure, who owned 25 percent. Whittemore did all of the negotiation for both Pacific Eastern and Harpeth and signed documents at the closing on behalf of both entities.

The transaction which closed on August 4, 1971 was between Harpeth, Pacific Eastern and Gulf Mortgage & Realty Investment (GMRI), Gulf Life's real estate investment trust.[1] The deal that was structured consisted of Harpeth's selling the land to GMRI for $250,000, GMRI's leasing the land to Pacific Eastern for 50 years and Pacific Eastern's receiving from GMRI a construction loan in the maximum amount of $1.4 million. Executed simultaneously at the closing were a Warranty Deed, Ground Lease, Leasehold Loan Agreement, Deed of Trust Note, Leasehold Deed of Trust, and Security Agreement. (Exs. 3–8)

The transaction was structured by David Foster, a partner in a "prestigious" (Mr. Pou's word) Jacksonville, Florida law firm, who hired Nashville attorney Alfred Abbey to review the transaction for compliance with Tennessee law. Mr. Abbey reviewed and significantly revised the transaction documents prior to closing to bring them into compliance with Tennessee law and attended the closing as GMRI's counsel. Richard Bird, another Nashville attorney and secretary of Harpeth, acted as counsel for Pacific Eastern at the closing.

Pacific Eastern used the $1.4 million loan to construct a 150–room hotel on the leased land. When construction was completed in July 1974, the loan balance totaled $1,366,884.61. Pacific Eastern made three monthly payments to GMRI: (1) base rent of $1,980; (2) additional rent of 2% of the gross room revenues from the hotel; and (3) principal and interest payments totaling $12,665 on the loan.[2] Under the lease, Pacific Eastern assumed all risk of loss and agreed to pay all expenses or charges related to the property, including taxes and insurance. (Ex. 4.) Monthly payments were made to GMRI and its successors until January 1991, when Pacific Eastern reduced its monthly loan payment from $12,665 to $3,878.88 until March 1992. Pacific Eastern resumed its regular payments in March 1992 and began making additional principal payments on the loan. (*See* Agreed Stipulations filed July 7, 1998.)

Plaintiffs filed suit in Davidson County Chancery Court on January 20, 1993,[3] alleging that the lease was a disguised loan and, therefore, the sale-leaseback and loan transaction was usurious. By this time, however, GMRI no longer existed. GMRI, after changing its name to GMR Properties in 1977, merged with Grubb & Ellis in December 1980. Just before the merger, GMR Properties sold the loan to Manufacturers Hanover and the land to one of Manufacturer Hanover's subsidiaries, ITR Properties, Inc., in June 1980. By 1993, Chase Manhattan Bank (Chase) had acquired the loan through a series of mergers with Manufacturers Hanover and Chemical Bank. The land is still

---

1. A real estate investment trust (REIT) provided tax advantages to the entity that formed it. REITs were prohibited from employing people or operating businesses and so used "advisors" to handle their affairs. The advisor for GMRI was Gulf Real Estate Advisory Services, Inc., which employed William Pou, the loan officer for this transaction.

2. The parties were unable to substantiate whether payments on the lease or loan were made prior to July 1974, because no documentation could be found. Mr. Whittemore testified that the lease payments were made with loan disbursements during the construction period. In a letter dated August 4, 1971, from Mr. Pou to Mr. Whittemore, GMRI assured Pacific Eastern that future loan disbursements could be used to make the monthly rent payments under the ground lease and to make the accrued interest payments on the loan. (Ex. 10.)

3. Some time after the filing of the complaint, Pacific Eastern began depositing payments with the chancery court. (Agreed Stipulations filed July 7, 1998.) After the bankruptcy filing, Pacific Eastern segregated certain funds representing the lease payments. (*Id.*)

owned by ITR Properties, which is now a subsidiary of Chase.

Pacific Eastern filed a Chapter 11 petition with this court on February 21, 1997. It removed the chancery court action to the U.S. District Court for the Middle District of Tennessee on April 25, 1997. When the action was referred to this court on June 5, 1997, the only remaining defendants were Chase and ITR Properties.

Defendants Chase and ITR Properties assert that the sale-leaseback and loan transaction is not a disguised usurious loan. They also assert that plaintiffs' claims are barred by laches and barred because they are holders in due course. Following an unsuccessful settlement conference, failed attempts at mediation, and the denial of defendants' summary judgment motion, a bench trial was held by this court on July 15 through 17, 1998.

## II

### Laches

■ In Tennessee, the laches doctrine applies to all suits, legal or equitable, "where the party invoking it has been prejudiced by the delay." *Archer v. Archer*, 907 S.W.2d 412, 416 (Tenn.Ct.App.), *application for permission to appeal denied* (Tenn.1995); *see Sutton v. Davis*, 916 S.W.2d 937, 940–41 (Tenn.Ct.App.1995) ("[L]aches may also bar purely legal claims."), *application for permission to appeal denied* (Tenn.1996). *But see Union Planters Nat'l Bank v. Markowitz*, 468 F.Supp. 529, 533 (W.D.Tenn.1979) (citing only legal treatises to support that laches is not "a valid defense to an action brought solely at law"). Laches may be used to bar a claim for which the statute of limitations has not expired. *State v. Abernathy*, 159 Tenn. 175, 17 S.W.2d 17, 20 (1929); *Sutton*, 916 S.W.2d at 941; *Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn.Ct. App.), *application for permission to appeal denied* (Tenn.1990); *Clark v. American Nat'l Bank & Trust Co.*, 531 S.W.2d 563, 572 (Tenn.Ct.App.1974), *cert. denied* (Tenn.1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 786, 46 L.Ed.2d 644 (1976). *But see Edmondson v. Mandrell (In re Mandrell)*, 39 B.R. 455, 459

(Bankr.M.D.Tenn.1984) (citing Sixth Circuit case that interprets Ohio law to support that "laches is inappropriate when a specific statute of limitations is provided by applicable law"). In such cases, however, the Tennessee Court of Appeals requires a showing of "gross laches." *Sutton*, 916 S.W.2d at 941; *Consumer Credit Union*, 801 S.W.2d at 825; *Clark*, 531 S.W.2d at 572.

■ Defining gross laches requires a review of the two Tennessee Supreme Court opinions, *State v. Abernathy*, 17 S.W.2d at 20, and *Carpenter v. Wright*, 158 Tenn. 289, 13 S.W.2d 51 (1929), that the Tennessee Court of Appeals cites to support its adoption of that standard. *See Clark*, 531 S.W.2d at 572 (citing *Abernathy* and *Carpenter*); *see also Sutton*, 916 S.W.2d at 941 (citing *Clark*, *Abernathy*, and *Carpenter*); *Consumer Credit Union*, 801 S.W.2d at 825 (citing *Clark*). *Abernathy* holds that the statute of limitations should be applied if the laches defense is based solely on an undue delay in filing the action. 17 S.W.2d at 20. But both *Abernathy* and *Carpenter* hold that laches will bar a claim filed within the limitations period if there is an unreasonable and inexcusable delay combined with loss of evidence that prejudices the defendant. *Id.; Carpenter*, 13 S.W.2d at 54–55 (using the phrase "unreasonable and inexcusable delay"). Gross laches, as that term is used by the Tennessee Court of Appeals, therefore, requires (1) unreasonable and inexcusable delay in filing the action; (2) loss of evidence; and (3) prejudice to the defendant.

The Chancery Court case was found to have been filed within the limitations period by the Tennessee Court of Appeals in *Pacific Eastern Corp. v. Gulf Life Holding Co.*, 902 S.W.2d 946 (Tenn.Ct.App.1995). Therefore, this court must determine whether the three elements required for gross laches have been proven.

■ Mr. Whittemore was a sophisticated, fifty-year-old businessman at the time of this transaction. He testified that he was the "lead borrower" who negotiated and executed the transaction for Pacific Eastern. In addition to his interests in Harpeth and Pacific Eastern, Mr. Whittemore developed an office

park in the 1970s that is adjacent to Pacific Eastern's hotel. (*See* Ex. 1b.) Mr. Whittemore also owns an interest in several other developments. (Exs. 1a, RRR1 at 41.)

As a sophisticated businessman, Mr. Whittemore made sure his businesses were well represented by counsel in the transaction with GMRI. Mr. Bird, the secretary of Harpeth, testified that he represented Pacific Eastern in the transaction with GMRI. (Ex. QQQ at 6.). Mr. Bird issued an opinion letter that stated that the Ground Lease, Leasehold Deed of Trust, and Deed of Trust Note constitute "binding obligations upon [Pacific Eastern]." (Ex. TT.) Mr. Bird also attended the closing of the transaction and prepared and signed a Certified Resolution of Harpeth's Board of Directors dated August 4, 1971. (Ex. SS.) The resolution states that, at a meeting of the directors held at the closing of the GMRI/Pacific Eastern transaction, the directors approved the sale of the land to GMRI. In addition to consulting Mr. Bird on behalf of Pacific Eastern and Harpeth, Mr. Whittemore consulted his "good attorney friends in Atlanta" for advice on the transaction.[4] (Ex.2d.)

For more than twenty-one years, Pacific Eastern treated the transaction with GMRI as a separate lease and loan. Pacific Eastern reported the lease as such on its financial statements and tax returns and benefitted from the tax advantage of treating the transaction as a separate lease and loan. In fact, independent accountants that audited Pacific Eastern's books and prepared its tax returns opined that the transaction was properly reported as a lease and loan.[5]

Pacific Eastern began having financial problems in early 1991 and failed to make full loan payments from January 1991 through February 1992. (Agreed Stipulations filed July 7, 1998.) In 1992, Pacific Eastern attempted to exercise its purchase option under the lease, although the option did not mature until August 4, 1996. (Ex. 4.) The defendants expressed a willingness to sell the land prior to that maturity date, but the parties could not agree on a fair market value for the land, which, under the option, was to be the purchase price. It was in this context, more than twenty-one years after the closing, that Pacific Eastern decided there was something amiss in its dealings with GMRI. It filed suit in state court, alleging that the original transaction was usurious.

Lost documents and forgotten facts permeated the trial of this matter. The clearest example was Mr. Pou's testifying that he did not attend the closing in Nashville on August 4, 1971, despite his signature on certain closing documents. (Exs. 4, 5, 9, 10.) Mr. Whittemore also testified that Pou did not attend. Mr. Abbey, however, remembered that Pou was there and found a copy of a letter in his file written the day after closing, which stated how nice it was to have met Pou the day before at the closing.

Most documents introduced at trial which related to the negotiation of the transaction were letters written or received by Whittemore that apparently came from his files. What was missing was documents from the other side of the transaction. John Kimball, Managing Director of Chase, testified that Chase does not have all the usual records for Pacific Eastern's loan. He stated that the records have been misplaced, most likely because of the numerous mergers between Chase, Chemical Bank, and Manufacturers Hanover over the years and the associated movement of people. Miriam Kulnis, a Vice President with Chase and the Vice President and Asset Manager of ITR Properties (the owner of the land), testified that it has been very difficult to defend this action. There are few documents available and fewer people who have any useful knowledge about the transaction.

---

4. At the same time Mr. Whittemore was negotiating the Pacific Eastern transaction with GMRI, the Atlanta attorneys were handling an office park development (presumably the one adjacent to the hotel location) that Mr. Whittemore financed through a First National Bank REIT. (Ex. 2d.)

5. David Smith, plaintiffs' expert, was responsible for those audits and tax returns in the early 1970s. He testified that he rendered advice about Pacific Eastern's business decisions prior to the closing of the transaction with GMRI. He, however, does not remember if or when he met with all three of the Pacific Eastern investors.

Mr. Pou (who was eighty years old at the time of trial) also has little memory about the details of the negotiations with Mr. Whittemore prior to closing. He cannot recall if he ever wrote a letter to Whittemore telling him GMRI would give him a $1.65 million loan. Although he testified that he had no other involvement in the transaction after the commitment letter was executed on May 4, 1971, documents evidence otherwise. Pou wrote a letter to Whittemore on May 11, 1971, in which he stated that he had been discussing the addition of the purchase option to the transaction with GMRI's "general counsel's firm." (Ex. 2e.) In a letter dated May 26, 1971, Pou told Whittemore about the purchase option he was prepared to recommend to GMRI's investment committee. (Ex. 2f.) Pou also authored a memorandum to the investment committee dated July 9, 1971, in which he recommended the purchase option. (Ex. 2g.) And, of course, Pou attended the closing and signed certain closing documents.

Because most witnesses have little memory of the details surrounding the transaction, Chase and ITR Properties were unable to elicit any clear testimony to defend against plaintiffs' allegations regarding the closing statement. In trying to prove that the transaction was a disguised usurious loan, plaintiffs relied on the commingling of the sale-leaseback and loan on one closing statement, the allegation that the proceeds from the land sale were used to pay Pacific Eastern's closing costs, and the allegation that the remainder was disbursed at closing to Pacific Eastern instead of to Harpeth.

Alfred Abbey, the closing attorney, testified that either Charles Whittemore, Richard Bird, or GMRI's attorney (David Foster) asked him to prepare the commingled closing statement, but that he cannot remember which one of them made the request. Abbey also does not remember exactly how the proceeds from the sale of Harpeth's land were disbursed. He believes the sale proceeds would have been disbursed by a check written on his escrow account and payable to Harpeth or Harpeth and Pacific Eastern, but not Pacific Eastern alone, but his escrow account records are no longer available. Mr. Bird, who reviewed the closing documents [6] and attended the closing as counsel for Pacific Eastern, has no memory of anything related to the transaction. Pou and Whittemore cannot even recall Pou's attendance at the closing, much less the details associated with the closing that are important to both parties.[7]

Because of lost evidence, there was no way to prove or disprove that Gulf Life Insurance Company participated in the loan. This fact was material to plaintiffs' argument that the life insurance premiums paid to Gulf Life on a policy insuring Whittemore, which GMRI apparently required to be purchased from Gulf Life, were disguised interest payments. No one, however, could recall whether Gulf Life participated, (see Exs. FFF & GGG), and no documents could be found to prove that they did or did not have an interest in this transaction.

Lost evidence also makes it impossible to determine whether a $28,000 fee paid by Mr. Whittemore when he executed the commitment letter was refunded after the transaction closed. Plaintiffs seek recovery of this fee and argue that it constitutes additional interest charged. Although Whittemore testified that the fee was paid and never refunded, he could not find a canceled check evidencing payment. He also could not remember who made the payment—Pacific Eastern, Harpeth, or himself. All records that might show any refund of the fee have been lost. No one associated with GMRI had any memory about the nature of the fee or why it may not have been refunded.

The testimony of Richard Bird (by deposition) starkly demonstrates the loss of evidence due to the delay in bringing suit which prejudiced the defendants. Mr. Bird played

---

6. Mr. Abbey also cannot recall whether he sent the closing statement along with the other sale-leaseback and loan documents to Mr. Bird prior to closing.

7. For example, Pou can remember nothing about a $15,000 loan disbursement made to Pacific Eastern at the closing which he himself separately initialed. If this was a disbursement of the loan proceeds, it may have been used to pay Pacific Eastern's closing costs. If the disbursement was something else, then Harpeth paid Pacific Eastern's closing costs as plaintiffs allege.

a critical role in this transaction. He was counsel for Pacific Eastern and issued an opinion letter to GMRI dated August 4, 1971. (Ex. TT.) That letter stated that Mr. Bird and his law firm "reviewed the Ground Lease, Leasehold Deed of Trust and Deed of Trust Note" and, in their opinion, the execution of them "constitutes a binding obligation upon the Corporation." Bird, as secretary of Harpeth, also signed the Certified Resolution of Harpeth's Board of Directors dated August 4, 1971. (Ex. SS.) He was one of the three people who might have instructed Mr. Abbey to treat Harpeth and Pacific Eastern as interchangeable entities on the closing statement.

Mr. Bird has no memory of this transaction. He left the Pacific Eastern file with his old firm in 1987 and has no records related to it. (Ex. QQQ at 8.) He does not recall how the deal between GMRI, Pacific Eastern, and Harpeth "transpired." (*Id.* at 9–10.) Although he probably reviewed the commitment letter executed by Mr. Whittemore, he has no memory of "any of [it]." (*Id.*) When Bird was asked to look at the Leasehold Deed of Trust executed by Mr. Whittemore and Dr. Anderson at closing, he testified that, after twenty-seven years, he could not identify it as the same document he reviewed prior to closing and referred to in his opinion letter. (*Id.* at 11–12.) He also has no recollection of participating in any negotiations with GMRI, reviewing any documents associated with the transaction, or preparing the Certified Resolution or opinion letter in connection with the transaction. (*Id.* at 9–13.)

The plaintiffs' delay of over twenty-one years before bringing suit was unreasonable and inexcusable. Much evidence was lost because of the delay, and the defendants were prejudiced thereby. The doctrine of laches, therefore, bars this action.

Even if the court's ruling on laches were not dispositive, the plaintiffs have failed to carry their burden of proving by a preponderance of the evidence that this was a disguised usurious transaction.

## III

### Disguised Usurious Transaction

The plaintiffs have the burden of showing that the substance of the transaction is a disguised usurious loan. *See* TENN. CODE ANN. § 47–14–110(b) (Michie 1995); *Jahn v. M.W. Kellogg Co. (In re Celeryvale Transport, Inc.)*, 822 F.2d 16, 18–19 (6th Cir.1987); *Lake Hiwassee Development Co. v. Pioneer Bank*, 535 S.W.2d 323, 327 (Tenn.1976). The plaintiffs have not carried that burden.

To support their allegation that the sale-leaseback and loan transaction was a disguised usurious loan, plaintiffs rely primarily on *Halco Financial Services v. Foster*, 770 S.W.2d 554 (Tenn.Ct.App.), *permission to appeal denied* (Tenn.1989). In that case, the court held, based on a review of the substance of the transaction, that the lease was a disguised loan tailored by the lender to avoid Missouri's usury statute. *Ia.* at 556. The transaction consisted of a borrower's sale of his household goods to a lender for $25,000. In turn, the lender leased back the goods to the borrower for monthly payments totaling $60,750 and gave the borrower the right to repurchase the goods at fair market value as of the lease's termination date. The effective annual interest rate on the transaction was 31.62% per annum. *Id.* at 554. The court stated that, as a "rule," a transaction is prima facie usurious

> "where the lender, instead of making a direct loan secured by mortgage on the property of the borrower, requires of him an absolute conveyance of the property intended as security for the sum advanced, giving the borrower the privilege of *repurchasing at the price paid,* and also leasing to him the property at a rental in excess of the legal rate of interest on the sum advanced under the guise of purchase money."

*Id.* (emphasis added) (quoting 47 C.J.S. *Interest and Usury* § 130). The purchase option in *Halco* was at fair market value and the "rule," therefore, did not apply. Based on the substance of the transaction, however, the lease was a disguised usurious loan.

The Pacific Eastern transaction, like the one in *Halco*, contains an option to purchase at fair market value and, therefore, the transaction is not prima facie usurious. Any determination of usury must be based on the

substance of the transaction. The court disagrees with plaintiffs that the transaction in this case and *Halco* are the same. *Halco* was a two-party transaction in which the same entity was both lessee and seller. This action arises from a three-party transaction involving a separate seller, lessor, and lessee.

Tennessee courts determine the substance of a transaction by applying the following factors:[8] (1) "whether the so-called lessee is obligated to accept and pay for the property or is obligated only to return or account for the property according to the terms of the lease from which he may be excused only if he exercises his privilege of purchasing it;" (2) "[t]he intent of the parties ... [as] ascertained from the whole transaction, not merely from the language employed;" and (3) in "close cases," whether the so-called lease payments (when compared to the "original value of the property, its depreciation and likely value at the end of the term") compensate the owner for the use of the property or, instead, constitute "payments on an absolute obligation for the purchase price, as in a conditional sale." *United States Fidelity & Guaranty Co. v. Thompson & Green Machinery Co.*, 568 S.W.2d 821, 825 (Tenn.1978) (emphasis omitted); *see Jahn v. M.W. Kellogg Co. (In re Celeryvale Transport, Inc.)*, 822 F.2d 16, 17–19 (6th Cir.1987).

The plaintiffs' first witness, William Pou, testified that the structure of the transaction was developed by GMRI's attorneys who, in Pou's opinion, were from one of the most prestigious law firms in Jacksonville, Florida.[9] That firm also prepared the commitment letter and, with Mr. Abbey's help, the closing documents. Neither prior to closing nor after it did Pou ever raise any concern with the lawyers or his superiors that the transaction might be usurious. He testified that GMRI wanted to get between a 9.5% and 12% return on its motel loans but that "it

had to look to the laws of the state" in doing so. He offered no explanation as to why GMRI's attorneys would have structured this transaction to be usurious or illegal under Tennessee law. And apparently Pou never told Mr. Whittemore that he thought the transaction was usurious until Whittemore approached him in 1992 wanting to bring suit.

Mr. Pou testified that the transaction was structured to provide GMRI with an estimated "yield" of 10.25% on a total investment of $1.65 million. (Ex. 2a.) Plaintiffs rely on the estimated yield and actual yield received by GMRI and its successors to support their usury claim. The defendants do not dispute that the yield exceeded the 10% maximum interest rate allowable in Tennessee in 1971. Yield, however, is not the equivalent of interest. Instead, as plaintiffs' expert (David Smith) admitted, interest is only a component of yield. Plaintiffs' proof that the yield exceeded 10%, therefore, does not support their usury claim.

Plaintiffs rely heavily on the closing statement—the allegation that Harpeth's sale proceeds were used to pay Pacific Eastern's closing costs and that any remaining sale proceeds were distributed to Pacific Eastern instead of to Harpeth. Pou testified that the closing statement was "mixed up." (Ex. 9.) Whittemore testified that he was also confused by the closing statement, in that the net sale proceeds of $127,000 due to Harpeth, the entity owned entirely by him, were, instead, disbursed to Pacific Eastern, the entity of which he only owned a third. Whittemore testified for the first time at trial that he told Mr. Bird at closing that the closing statement was not right and that Harpeth was not receiving what it should from the sale proceeds. He testified that Bird told him to go ahead and close[10] and that "they

---

8. The U.C.C., as adopted by Tennessee, sets forth a test for determining whether a lease of goods creates a security interest. *See* TENN. CODE ANN. § 47–1–201(37) (Michie 1996). This test, however, is inapplicable to the Pacific Eastern case. *See United States Fidelity & Guaranty Co. v. Thompson & Green Machinery Co.*, 568 S.W.2d 821, 825 (Tenn.1978) (determining that the U.C.C. definitions should be applied "only in interpreting and administering the Uniform

Commercial Code; they are not intended to apply universally").

9. GMRI was represented by a private law firm in Jacksonville, Florida. Pou referred to this law firm as GMRI's general counsel.

10. The defendants cried "foul" when this testimony was elicited. Mr. Whittemore apparently had never asserted at deposition or otherwise

would settle up later." [11]

Alfred Abbey, the closing attorney, testified for the defendants. He stated that, normally, he would have prepared a separate closing statement for each part of a sale-leaseback and loan transaction. He prepared a consolidated closing statement here because one of three people asked him to do so—Charles Whittemore, Richard Bird (secretary for Harpeth and attorney for Pacific Eastern), or David Foster (GMRI's Florida lawyer). Abbey recalls that no one at the closing, including Pou, Whittemore, and Bird, raised a question about the closing statement. Abbey also reviewed the loan and lease documents for compliance with Tennessee law prior to the closing and made extensive changes that were incorporated by GMRI's Florida counsel. He testified that, in his opinion, the transaction was not usurious and the lease was not a disguised loan.

Plaintiffs' second witness was David Smith, a CPA and partner of a large, international accounting firm. He was qualified to testify only as an expert businessman and CPA. Smith's firm prepared Pacific Eastern's 1972 tax return, which treated the lease as a lease, not a loan. (Ex. CC.) Smith testified that that treatment was proper under generally accepted accounting principles and the tax code. The parties stipulated that Pacific Eastern has always treated the lease as a lease on its audited and unaudited financial statements, tax returns, and books.[12] Smith and the defendants' CPA witness both testified that, in order for this treatment to be in compliance with the tax code and generally accepted accounting principles, the accountants who prepared the debtor's tax returns and audited its financial statements were required to determine that the economic substance of the transaction was a separate lease and loan.[13] Smith testified that, "as a

tax man, this is a lease," but that "as a businessman, it looks like a loan."

Smith testified that GMRI's ownership of the land was inconsistent with its purpose and, therefore, the lease was really a disguised loan. Smith explained that, in the 1970s, there were two types of REITs: (1) investment trusts that owned and leased property, and (2) mortgage trusts that loaned money. GMRI, in Mr. Smith's opinion, was a mortgage trust and ownership of any property was inconsistent with its purpose. In light of defense testimony on this point, Smith's assertion is not persuasive.

Defendants' expert, Lester Alexander, a partner with a large accounting firm, explained that the normal role of REITs was to acquire income-generating assets and appreciating assets. In order to determine the role of GMRI, Alexander reviewed its prospectus, which set out its business plan. That prospectus stated that GMRI intended to acquire property and participate in the appreciation of the real estate market through transactions such as sale-leasebacks. GMRI's ownership of the land, therefore, does not appear to have been inconsistent with its purpose.

Smith also testified that the rental rate set forth in the lease has been higher than Nashville market rents since the motel opened, an indication that the payments under the lease were for something other than the use of the property. Pacific Eastern leased the property from GMRI for a base rent of $1,980, which equals an annual return of 9.5% on $250,000. Additional rent of 2% of gross room rentals was also required. The total return for the lease averaged 13% for the first two years after the motel opened. In Smith's opinion as a businessman, the market rate then and now is 10% on a fifty-year

---

that he had had this exchange with Mr. Bird at the closing. The defendants asserted that the plaintiffs had agreed to allow Mr. Bird to take a trip after the death of his wife and testify by deposition, knowing that Bird would not be able to respond to these new claims by Whittemore.

**11.** Mr. Whittemore testified that he believes that Harpeth received a note from Pacific Eastern for the difference. He did not produce that note.

**12.** Pacific Eastern's bookkeeper, Harold King, testified by deposition that Alton E. Turnipseed, the Certified Public Accountant who audited Pacific Eastern's books and financial reports, told him to report the transaction as a loan and lease. (Ex. RRR1 at 26, 67–68.)

**13.** Neither party introduced evidence on the tax effect of reclassifying the lease as a loan.

commercial lease, which is less than the return received by GMRI.

But, on cross examination, Smith admitted that hotels are risky and, therefore, a return higher than 10% might be justified. And the defendants countered Smith's testimony with the expert testimony of a witness with real estate credentials.

Defense witness Marvin Maes is a real estate appraiser and consultant, who has been in the appraisal business since 1972 and has held the MAI designation since 1978. He prepared an extensive report in which he calculated the market rate of the Pacific Eastern lease and compared it to other commercial land leases [14] in Nashville. (Ex. XX.) Maes calculated that the overall return on the Pacific Eastern lease was 14.4% and stated that, in his expert opinion, this return has been economically consistent with the Nashville market.

Mr. Whittemore was the last witness to testify for the plaintiffs. He testified that he sought a $1.65 million loan from GMRI to finance the construction of the hotel and that the loan and sale-leaseback was really a disguised $1.65 million loan by which defendants collected usurious interest. Whittemore insists that he told Mr. Pou on numerous occasions that he did not want to sell Harpeth's land. (*See* ex. 1j.) Yet, he signed the commitment letter for GMRI's offer of a sale-leaseback and loan transaction that did not even contain a repurchase option after negotiating with GMRI for some sixteen months. (Ex. PPP.) Prior to closing, Whittemore negotiated the addition of the repurchase option, (Exs. 2d-g, 4 at pp. 26–28), but he did not negotiate and did not receive a $1.65 million loan.

The structure of the sale-leaseback and loan as a three-party transaction supports the defendants' contention that the lease was not a disguised loan. Harpeth, not Pacific Eastern, sold the land to GMRI for fair market value in 1971. Charles Whittemore,

as sole owner of Harpeth, benefitted from this sale and not the other two shareholders of Pacific Eastern.[15]

The provisions of the Ground Lease support the contention that the lease is not a disguised loan. The Ground Lease, executed on August 4, 1971, sets forth that Pacific Eastern is not obligated to become the owner of the property at the end of the lease term. Instead, if Pacific Eastern wants to own the land, it must pay fair market value at the time the purchase option is exercised. The option matured in 1996, when the property's fair market value was at least $688,500.[16]

Under the lease, Pacific Eastern was responsible for all taxes, insurance, maintenance, and repairs and assumed the risk of loss. Based on the expert testimony at trial, these lease provisions are consistent with most commercial land leases.

Plaintiffs argue that the debtor is economically compelled to repurchase the land and that, if the option is not exercised, the debtor will lose its hotel. Plaintiffs rely on two cases to support the economic compulsion theory. *See Jahn v. M.W. Kellogg Co. (In re Celeryvale Transport, Inc.)*, 822 F.2d 16 (6th Cir.1987) (per curiam); *American President Lines, Ltd. v. Lykes Bros. Steamship Co. (In re Lykes Bros. Steamship Co.)*, 196 B.R. 574 (Bankr.M.D.Fla.1996), *vacated* (July 17, 1997). In *Celeryvale*, the Sixth Circuit rejected the plaintiff's argument that it was economically compelled to exercise a repurchase option. In doing so, the court did not adopt economic compulsion as a valid theory; in fact, it cited no cases to support the theory. In *Lykes*, the bankruptcy court was interpreting New York's version of the U.C.C. 196 B.R. at 581. The court held that leases were disguised financing arrangements based, in part, on a discussion of whether the purchase option price was nominal, using the economic compulsion theory. *Id.* at 581, 585.

---

**14.** For the comparison, Maes used nine sale-leasebacks of motel sites, a land lease to a branch bank, and two leases of shopping center sites. (Ex. XX at 8.)

**15.** Whittemore testified that, despite the "mixed up" closing statement, he thinks Pacific Eastern

gave Harpeth a note for the net proceeds due it from the sale of the land.

**16.** The parties stipulated that in 1994 Mr. Whittemore agreed to an appraised land value of $688,-500 in conjunction with a Metropolitan Tax Appraisal. (Ex. X.)

This court, in a case applying Tennessee's version of the U.C.C., has considered the economic compulsion theory in determining whether a purchase option in a rent-to-own contract could be exercised for nominal consideration. *See Consumer Lease Network, Inc. v. Puckett (In re Puckett)*, 60 B.R. 223, 240 (Bankr.M.D.Tenn.1986), *aff'd*, 838 F.2d 470 (6th Cir.1988) (per curiam), *superceded on other grounds by* TENN. CODE ANN. §§ 47–18–601 to –614 (Michie 1995); *see also In re Osborne*, 170 B.R. 367, 368–69 (Bankr. M.D.Tenn.1994) (discussing the effect of the Tennessee Rental–Purchase Agreement Act enacted in 1987). That case involved personal property. The case here concerns a lease of real property. Tennessee's version of the U.C.C. does not apply to real property and *Puckett*, therefore, is distinguishable.

Even if this court adopted the economic compulsion theory, plaintiffs have not presented sufficient evidence to support its application. The purchase option matured on August 4, 1996, twenty-five years after execution of the fifty-year lease. Since then, Pacific Eastern has had the right to buy the property at the fair market value of the bare land (without considering the value of the hotel). In order for Pacific Eastern to prove it is economically compelled to exercise the purchase option, it must show that it was foreseeable in 1971 that the hotel would be a valuable, operating entity in 1996 or that the value of the improvements would economically compel the debtor to exercise the purchase option when it matured. *See In re Air Vermont, Inc.*, 44 B.R. 440, 446 (Bankr.D.Vt. 1984) (holding that the "economic compulsion test ... is founded on the proposition that the 'economic compulsion' arises out of residual value that was inherent in the subject matter at the time of execution of the relevant agreement"). No such evidence was introduced. There was testimony that hotels require extensive renovations every seven years and, therefore, some investors are reluctant to enter long-term hotel deals.

In addition, no evidence of the hotel's actual value or its forecasted revenues and expenses, including renovation costs, was introduced. Without this minimal information, the court is unable to determine whether Pacific Eastern would obtain the highest return on its hotel investment by exercising the purchase option, by continuing to operate under the lease until it expires, or by terminating the lease and surrendering the improvements to the lessor.[17] The court is simply left to speculate on whether Pacific Eastern is economically compelled to exercise the purchase option.

Based on the evidence, the substance of the transaction is not a disguised $1.65 million loan. Under the lease, Pacific Eastern is obligated only to return use of the land to the lessor at the end of the fifty-year lease term. Pacific Eastern will be excused from this obligation only if it exercises the purchase option. There is no evidence to support the contention that Pacific Eastern is economically compelled to exercise the purchase option. The testimony of plaintiffs' three witnesses does not establish that the parties intended this to be a disguised $1.65 million loan. Instead, the parties intended a sale-leaseback and loan transaction. The lease payments compensate the owner for the use of the property. The payments are not for the purchase of the property.[18]

The plaintiffs have the burden of proving their usury claims by a preponderance of the evidence. They have failed to carry that burden.

## IV

### Commitment Fee

The plaintiffs seek recovery of a $28,000 commitment fee paid in conjunction with

---

17. There is also no evidence of the forecasted rent payments during the last twenty-five years of the lease, i.e., from maturity of the option to the end of the lease term. *See Lykes Bros. Steamship Co.*, 196 B.R. at 581. If the plaintiffs had shown that these rent payments would be significantly more than what the land could be purchased for in 1996, the purchase option price might have been considered nominal and Pacific Eastern might have been found to be economically compelled to exercise the option.

18. Although this is not a "close case," the court has considered the third factor in determining the substance of the transaction. *See United States Fidelity & Guaranty Co.*, 568 S.W.2d at 825.

Mr. Whittemore's execution of the commitment letter on May 4, 1971. Paragraph fifteen of the letter provides:

Concurrently with your acceptance hereof, and so long as this commitment shall remain in effect, you shall maintain on deposit with us as security for the performance of your obligations hereunder $28,000.00 in cash, which we shall hold but not in trust and without interest. If, for any reason, the transaction contemplated hereby is not consummated and the Loan is not acquired by us within the time herein set forth for such consummation and acquisition by us, we shall have the right, in our absolute discretion, and without the requirement of any notice to you, to apply said amount in payment of the liquidated damages and expenses required to be paid by you hereunder. It is further understood that if the Loan herein contemplated shall have been acquired by us as herein provided and if you have paid the expenses required to be paid by you, we shall return the aforesaid deposit to you.

(Ex. PPP at 6.) The commitment letter required that the transaction close no later than August 1, 1972. The transaction contemplated in the commitment letter did not contain a purchase option.

Pacific Eastern did not meet the deadline for closing, and the transaction, as contemplated in the commitment letter, was not consummated. The transaction closed on August 4, 1972, after the August 1 deadline. The transaction consummated included a purchase option that Mr. Whittemore negotiated after he executed the commitment letter. Arguably, the conditions of paragraph fifteen of the commitment letter were not satisfied and, therefore, GMRI was not required to return the fee. But even if this does not dispose of this claim, it fails on other grounds.

Defendants argue that plaintiffs' action to recover the fee is barred by the three-year statute of limitations that bars "any claim for excessive loan charges, commitment fees, or brokerage commissions." TENN. CODE ANN. § 47–14–118(b) (Michie 1995). Alternatively, defendants argue that it is barred by the six-year limitations period for contract claims, TENN. CODE ANN. § 28–3–109(a)(3) (Michie 1980), or the ten-year period applicable in all cases not otherwise expressly provided for in the Tennessee Code, id. § 28–3–110(3). The fee was paid in 1971, and the plaintiffs did not file suit on any of its claims until 1993. No matter which statute of limitations applies, the plaintiffs have failed to comply with it.

And laches, too, provides a valid defense to this claim. The commitment fee was paid in May 1971. Mr. Whittemore testified that he caused the fee to be paid, although he does not remember whether he, Pacific Eastern, or Harpeth actually paid it. The canceled check evidencing payment cannot be found.

Mr. Pou, in a letter to Whittemore dated May 11, 1971, acknowledged receipt of the $28,000 check that Whittemore enclosed with the executed commitment letter. (Ex. 2e.) Pou testified that when he received the fee he promptly turned it over to his accounting department. Pou has no recollection of whether the fee was refunded. The payment and disbursement records for the transaction, which might prove that the $28,000 fee was returned, cannot be found.

By letter dated November 28, 1971, Mr. Whittemore requested Mr. Norman of Gulf Real Estate Advisory Services, Inc. to return the $28,000 fee.[19] (Ex. 11.) Whittemore testified that he wrote other letters about the fee, including one to Bill Wright at Manufacturers Hanover, who came to Nashville in 1981 shortly after GMRI sold the note to Manufacturers Hanover. According to Whittemore, that letter, like many others, should be in his files, but he has been unable to find it.

By the time this action was commenced in 1993, Mr. Whittemore himself had forgotten about the fee. The Amended Verified Com-

---

**19.** Whittemore testified that he does not know if the commitment fee was ever shown as an accounts receivable on Pacific Eastern's balance sheet but Pacific Eastern's accountants might know. Pacific Eastern's bookkeeper, Harold King, was not available to testify due to illness. At his deposition, he was not questioned about how the fee was reported on Pacific Eastern's financial records. (Exs. RRR1 & RRR2.)

plaint filed in Chancery Court makes no mention of the fee. (Ex. 17.) In fact, the complaint has never been amended to add an action to recover the $28,000 fee.[20] Whittemore testified that, after the Amended Verified Complaint was filed, accountants began reviewing Pacific Eastern's records and discovered that the fee had never been refunded.

The fee was paid more than twenty-one years before this action was commenced. Most documentation regarding the fee cannot be found. The payment and disbursement records that might show that the fee was refunded are no longer available. Defendants have been prejudiced by plaintiffs' undue delay and negligence in commencing their action to recover the fee. Plaintiffs will be denied recovery of the $28,000 fee.

## V

### Life Insurance Premiums

Pacific Eastern maintains that GMRI insisted in 1973 that it obtain a life insurance policy on Charles Whittemore from its affiliate, Gulf Life Insurance Company. The plaintiffs argue that Gulf Life had a 10–25% participation interest in this loan and that, therefore, the premiums paid by Pacific Eastern were additional interest. The Tennessee Court of Appeals determined in this case that the life insurance premiums might be classified as interest if Gulf Life did have a participating interest in the sale-leaseback and loan transaction. *See Pacific Eastern Corp.,* 902 S.W.2d at 959–60.

At trial, plaintiffs produced no evidence of Gulf Life's participation. Three witnesses who were in a position to know testified that they did not remember if Gulf Life was involved in the transaction.[21] One, Mr. Toole, testified that if Gulf Life had participated in

the transaction, its investment committee would have been required to approve the sale-leaseback and loan. There was no proof of such approval or that the transaction was even presented to Gulf Life's investment committee.

At the end of plaintiffs' case in chief, the court granted defendants' motion to dismiss the life insurance premium claim.

## VI

### Real Estate Taxes & Casualty Insurance

The Pretrial Order included as an issue whether the real estate taxes and casualty insurance paid by Pacific Eastern under the lease constitute additional interest. The plaintiffs included no argument on this issue in their trial brief and put on no proof at trial on this issue. The court, therefore, holds in favor of the defendants on this issue.

## VII

### Holder in Due Course Defense

Chase and ITR Properties raise as a defense that the Deed of Trust Note is negotiable and, therefore, they are holders in due course and not subject to plaintiffs' action. Plaintiffs presented three arguments in response to Chase and ITR's holder in due course defense.

First, plaintiffs argue that the note, on its face, is non-negotiable because it is not for a sum certain. (Ex. 6.) *See Resolution Trust Corp. v. Oaks Apartments Joint Venture,* 966 F.2d 995, 1001–02 (5th Cir.1992); *Yin v. Society Nat'l Bank,* 665 N.E.2d 58, 62–63, 31 UCC Rep. Serv.2d 168, 170–72 (Ind.Ct.App. 1996), *cert. denied,* 683 N.E.2d 581 (Ind. 1997). Defendants assert that the Amendment to Leasehold Deed of Trust and Note

---

**20.** Defendants did not object to the introduction of proof regarding the fee and plaintiffs made no motion to amend their complaint. *See* FED. R. BANKR. P. 7015(b).

**21.** These witnesses are Messrs. Toole, Durham, and Pou. Toole's and Durham's testimony was by deposition. (Exs. FFF, GGG.) Toole began working for Gulf Life in September 1971 as Senior Vice President, Treasurer, and Chief Investment Officer. Two to three months after starting at

Gulf Life, he was also named Trustee, Chairman, and CEO of GMRI. Durham was a mortgage loan representative with Gulf Life beginning in 1964. He subsequently became Vice President of Gulf Life's mortgage department and President of GMRI and Gulf Real Estate Advisory Services. Mr. Pou reported to Durham from the mid to late 1960s until Mr. Durham asked Mr. Pou to resign in the mid 1970s.

establishes a sum certain and, therefore, is negotiable. (Ex. M.)

Second, plaintiffs allege that GMRI sold the note in a liquidation or debt restructuring and, therefore, Chase and ITR cannot be holders in due course. *See* TENN. CODE ANN. § 47–3–302(c) (Michie 1996) ("[A] person does not acquire rights of a holder in due course of an instrument taken ... by purchase as part of a bulk transaction not in ordinary course of business of the transferor....").  Defendants deny that the sale was part of a bulk transaction.

Third, plaintiffs argue that the Tennessee Court of Appeals determined that the note was non-negotiable. *See Pacific Eastern Corp.,* 902 S.W.2d at 950 (referring to the note as non-negotiable). That court, however, was only stating the facts in the light most favorable to the nonmoving party, the plaintiffs. *See id.* at 949 (vacating summary judgment granted to movant defendants); *see also* TENN. R. CIV. P. 56; *Byrd v. Hall,* 847 S.W.2d 208, 210, 214–15 (Tenn.1993) ("[T]he court is to view the evidence in a light favorable to the nonmoving party and allow all reasonable inferences in his favor.").  The negotiability of the note was not briefed, argued, or disputed during the appeal and, therefore, the Court of Appeals' reference to the note as non-negotiable is not the law of this case. *See Hanover Ins. Co. v. American Eng'g Co.,* 105 F.3d 306, 312 (6th Cir.1997).

The court need not resolve whether Chase and ITR Properties are holders in due course.  Having determined that plaintiffs' action is barred by laches and that the transaction is not a disguised usurious loan, the holder in due course issue is moot.

## VIII

### Conclusion

Plaintiffs' action, which was filed more than twenty-one years after the closing of the transaction, is barred by laches.  Even if it were not, the plaintiffs failed to prove by a preponderance of the evidence that this transaction was a disguised usurious loan. Judgment will be granted in favor of defendants Chase Manhattan Bank and ITR Properties, Inc.